UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

# 05    10175 MLW

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION | ) |
| AMERICAN REFINING GROUP, INC. | ) |
| ATLANTIC RICHFIELD COMPANY | ) |
|   Individually and doing business as ARCO | ) |
|   Products Company (f/k/a ARCO Petroleum | ) |
|   Co.), and also known as ARCO | ) |
| ATOFINA PETROCHEMICALS, INC., | ) |
|   Individually and as Successor-by-merger | ) |
|   to Fina, Inc. | ) |
| BP AMOCO CHEMICAL COMPANY, | ) |
|   Individually and formerly known as Amoco | ) |
|   Chemical Company | ) |
| BP PRODUCTS NORTH AMERICA, INC. | ) |
|   Individually and as Successor-by-merger | ) |
|   to Amoco Oil Company and BP | ) |
|   Exploration and Oil Inc. (successor-by- | ) |
|   merger to BP North America Inc.) | ) |
| CHELSEA SANDWICH, LLC | ) |
| CHEVRONTEXACO CORPORATION | ) |
|   Individually and as successor-in-interest | ) |
|   to Texaco, Inc. | ) |
| CHEVRON U.S.A., INC. | ) |
|   Individually and formerly known as Gulf | ) |
|   Oil Corporation (d/b/a Chevron Products | ) |
|   Company, d/b/a Chevron Chemical | ) |
|   Company) | ) |
| CITGO PETROLEUM CORPORATION | ) |
| CITGO REFINING AND CHEMICALS | ) |
|   COMPANY, LP | ) |
| COASTAL OIL NEW ENGLAND, INC. | ) |
| COLORADO REFINING COMPANY | ) |
| CONOCOPHILLIPS COMPANY | ) |
|   f/k/a Phillips Petroleum Company, | ) |
|   individually and as successor-in- | ) |
|   interest to Tosco Corporation and d/b/a | ) |
|   Phillips 66 Company | ) |

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED N/A
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

MAGISTRATE JUDGE _____

CUMBERLAND FARMS, INCORPORATED )
EL PASO MERCHANT ENERGY- )
   PETROLEUM COMPANY )
      Individually and formerly known as Coastal )
      Refining and Marketing, Inc. and formerly )
      Known as Coastal States Trading, Inc. )
EQUILON ENTERPRISES, LLC )
      d/b/a Shell Oil Products US, individually )
      and as successor-by-merger to Equiva )
      Services LLC )
EQUISTAR CHEMICALS, LP )
EXXONMOBIL CHEMICAL COMPANY, )
      Individually and formerly known as Mobil )
      Chemical Company, Inc. )
EXXON MOBIL CORPORATION )
      f/k/a Exxon Corporation (and d/b/a as )
      ExxonMobil Refining and Supply Company, )
      Exxon Chemical USA and d/b/a ExxonMobil )
      Chemical Corporation) )
EXXONMOBIL OIL CORPORATION )
FHR/GP, LLC )
      Individually and as general partner of )
      Flint Hills Resources, LP )
FLINT HILLS RESOURCES, LP )
      f/ka/ Koch Petroleum Group LP )
GIANT YORKTOWN, INC. )
GLOBAL COMPANIES, LLC )
GLOBAL MONTELLO GROUP, LLC )
GLOBAL PETROLEUM CORPORATION )
GULF OIL, LIMITED PARTNERSHIP )
      Formerly known as Catamount Petroleum )
      Limited Partnership )
LYONDELL CHEMICAL COMPANY )
      Individually and formerly known as )
      Lyondell Petrochemical Company and )
      formerly known as ARCO Chemical )
      Company )
LYONDELL-CITGO REFINING, LP )
LYONDELL PETROCHEMICAL GP, INC. )
      Individually and as general partner of )
      Equistar Chemicals, LP )
MOBIL CORPORATION )
MOTIVA ENTERPRISES, LLC )
      Individually and formerly known as Star )
      Enterprises LLC )
PDV MIDWEST REFINING, LLC )

PLACID REFINING CO., LLC )
THE PREMCOR REFINING GROUP, INC. )
    Individually and formerly known as Clark )
    Refining )
SHELL OIL COMPANY )
SHELL OIL PRODUCTS COMPANY )
SHELL OIL PRODUCTS COMPANY, LLC )
SHELL PETROLEUM, INC. )
SHELL TRADING (US) COMPANY, )
    Individually and formerly known as Equiva )
    Trading Company, and also known as )
    Stusco )
SUNOCO, INC. )
    Individually and formerly known as Sun Oil )
    Company, and formerly known as Sun )
    Company, Inc., and as successor-in-interest )
    to Coastal Eagle Point Oil Company )
SUNOCO, INC. (R&M) )
    Individually and formerly known as Sun )
    Refining and Marketing Company and )
    Formerly known as Sun Company, Inc. )
    (R&M) )
TEXACO, INC. )
TMR COMPANY )
    f/ka/ Texaco Refining and Marketing, Inc., )
    individually and as Successor-by-merger to )
    TRME Company(f/k/a Texaco Refining )
    and Marketing (East)) )
TOSCO CORPORATION )
    Individually and as predecessor-in-interest )
    to ConocoPhillips Company, and also known )
    as Tosco Refining Company, and also known )
    as Tosco Marketing Company )
TPI PETROLEUM, INC. )
UNION OIL COMPANY OF CALIFORNIA )
    d/b/a Unocal )
UNITED REFINING COMPANY )
UNOCAL CORPORATION )
    Individually and formerly known as Union )
    Oil Company of California )
VALERO ENERGY CORPORATION )
VALERO MARKETING AND SUPPLY CO. )
VALERO REFINING COMPANY )
VALERO REFINING AND MARKETING CO. )
    )
               Defendants. )

## NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF THIS COURT:

The undersigned Defendants ("Defendants"), by their attorneys and pursuant to 28 U.S.C. § 1441 *et seq.*, file this Notice of Removal for the action captioned *City of Lowell v. Amerada Hess Corporation, et al.* case no. 04-5654, from the Superior Court Department Suffolk County, Massachusetts to the United States District Court for the District of Massachusetts. The basis for removal is as follows:

1.    On December 30, 2004, the City of Lowell filed its Complaint in the Superior Court Department Suffolk County, Massachusetts. (A copy of the Complaint is attached hereto as Exhibit 1.)

2.    Section 1442(a)(1) of Title 28 provides that a civil action commenced in a state court may be removed to the district court of the United States for the district and division embracing the place wherein it is pending when it is brought against "[] Any officer of the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office...." 28 U.S.C. § 1442(a)(1). Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate because this action is one brought against companies acting under the direction of a federal officer or agency at the time of the conduct of which Plaintiff complains.

3.    28 U.S.C. § 1452(a) addresses removal of claims related to bankruptcy cases and allows a party to "remove any claim or cause of action in a civil action. . . to the district court where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under Section 1334 of this title." In turn, 28 U.S.C. § 1334(b) provides that the "district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title

1

11, or *arising in* or *related to* cases under title 11." Defendant Texaco, Inc. filed a voluntary petition under Chapter 11 of the Bankruptcy Code in 1987.

4.    28 U.S.C. § 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . , to the district court of the United States for the district and division embracing the place where such action is pending."

5.    28 U.S.C. § 1331 provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." Plaintiff's claims require resolution of a substantial federal question and arise under the laws of the United States.[1]

6.    Removal is also appropriate where the federal government has completely preempted the field. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). Plaintiff's state law tort claims are preempted by the provisions of the Clean Air Act.[2]

7.    The Defendants in this action were acting at the direction of a federal agency at the time of the conduct of which Plaintiff complains, 28 U.S.C. § 1442(a)(1), and removal is therefore appropriate. *See In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 342 F.Supp.2d 147, 159 (S.D.N.Y. March 16, 2004)("*MTBE III Opinion*"); *see also, In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 341 F.Supp.2d 351, 360 (S.D.N.Y. July 13, 2004); *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 341 F.Supp.2d 386, 416 (S.D.N.Y. Sept. 3, 2004)("*MTBE V Opinion*"). This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334 (bankruptcy jurisdiction)

---

[1] *But see, In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 341 F.Supp.2d 386, 403 (S.D.N.Y. Sept. 3, 2004)(holding that the Court lacked substantial federal question jurisdiction).
[2] *But see, id.* at 411 (holding that plaintiff's claims were not preempted by the fuel regulations authorized by Congress).

and removal is appropriate pursuant to 28 U.S.C. § 1452. *See MTBE V Opinion* at 415.

Additionally, this Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiff's

claim raises a substantial federal question and because federal law has completely preempted the

filed of oxygenated fuels. Further this Court has jurisdiction based on preemption of Plaintiff's

state tort law claims.

      8.    This Notice of Removal is filed in the District Court of the United States for the

district in which this suit was filed.

      9.    The undersigned defendants have contacted each other defendant and found none

that have been served at this time. This Notice of Removal is filed within the time frame

provided by 28 U.S.C. § 1446(b).

      10.    Defendants who have not been served need not join in, or consent to, removal.

*See, e.g., Luckett v. Harris Hospital-Fort Worth,* 764 F. Supp. 436, 442 (N.D. Tex. 1991)

("Under a recognized exception to the general rule, [a party] need not have been joined in the

notice of removal inasmuch as it had not been served with state court process."); *Lonthier v.*

*Northwest Ins. Co.,* 599 F. Supp. 963, 964 (W.D. La. 1985) ("Where all of the defendants do not

sign the removal petition, the petition must set forth a reason, such as lack of service, for not

including all of the defendants."); *see also, PP. Farmers' Elevator Co. v. Farmers Elevator Mut.*

*Ins. Co.,* 395 F.2d 546, 547-48 (7th Cir. 1968). Nonetheless, written consents from all

defendants are included in Appendix A. For obvious reasons, the law is clear that fictitious or

non-existent parties are not required to join in or consent to the removal.[3]

11.    This notice of removal is without prejudice to the right of any defendant to object to the Court's exercise of personal jurisdiction over that defendant.

12.    Pursuant to the requirements of 28 U.S.C. § 1446(d), Defendants will promptly file a copy of this Notice of Removal with the Clerk of the Superior Court Department, Suffolk County, Massachusetts, where the action was originally filed.  Defendants have also served Plaintiff with this Notice of Removal.

## SUMMARY

13.    This removal is necessitated by a broadside attack on the comprehensive federal system that regulates the content of gasoline, which expressly authorizes and effectively requires the conduct that the Plaintiff seeks to prohibit based on far-fetched theories of state common law. Over sixty lawsuits have been filed since September 30, 2003, in courts in states around the country, asserting that the inclusion of methyl tertiary butyl ether ("MTBE") in gasoline constitutes an inherent design defect.  These cases – seeking damages, fines, and injunctive relief under a patchwork of various states' laws as a result of the gasoline industry's use of MTBE to comply with the federal Clean Air Act ("CAA") and its implementing regulations – threaten the integrated national system for the supply and distribution of gasoline and highlight the need for federal judicial resolution of these claims.  At their core, these cases challenge who may determine the content of gasoline nationwide:  the Environmental Protection Agency ("EPA"),

---

[3] *United Computer Sys.  v. AT&T Info. Sys., Inc.*, 298 F.3d 756, 762 (9th Cir. 2002), *reh'g denied,* 2002 U.S. App. LEXIS 22542 (9th Cir. July 22, 2002) ( "nominal" defendants need not consent to removal); *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1009 n.2 (3d Cir. 1987)("nominal" parties are disregarded in determining whether all defendants consent to removal); *GMFS, L.L.C. v. Bounds*, 275 F. Supp. 2d 1350, 1354 (S.D. Ala. 2003) ("fictitious defendants need not join in or consent to removal"); *Hicks v. Emery Worldwide, Inc.*, 254 F. Supp. 2d 968, 975 (S.D. Ohio 2003) (nonexistent defendant need not consent to removal).

charged by Congress with that authority, or disparate civil juries in state courts in multiple jurisdictions in countless separate actions.

14.     Piecemeal state court litigation will result in scores of state courts across the country independently interpreting the CAA and EPA regulations regarding fuel content. Inconsistent decisions from state to state would interfere with and disrupt the federal regulatory regimen, putting the oil industry in the impossible situation of trying to comply with federal regulations at the risk of incurring substantial state penalties and civil liability. The orderly supply of gasoline would be threatened as would the viability of the national gasoline distribution system. In sum, the state MTBE actions implicate substantial federal questions in an area – the content of motor fuel – that has been pervasively occupied by federal statutes and regulations. Accordingly, these claims must be resolved in federal, rather than state, court.

15.     In 1999, several MTBE cases were removed and consolidated in the United States District Court for the Southern District of New York in MDL 1358 – *In re MTBE Products Liability Litigation*. After the court dismissed much of those claims and refused to certify four statewide purported class actions, the individual actions were settled and dismissed. MDL 1358 remained pending but inactive.

16.     Since September 2003, Defendants have removed and filed Notices of Relatedness for over sixty MTBE cases filed in courts across the country, requesting that the Judicial Panel for Multidistrict Litigation ("JPML") consolidate and transfer the cases to MDL 1358. The JPML transferred 76 cases – 63 similar to the case before this Court and 13 declaratory judgment actions related to MTBE – to MDL 1358. Simultaneous with this Notice of Removal, Defendants will give notice of relatedness to the JPML and request transfer of this action to MDL 1358.

17.    The Honorable Shira Scheindlin denied plaintiffs' Motion to Remand the cases pending in MDL 1358 on March 16, 2004 holding that the Court had federal agent jurisdiction pursuant to section 1442(a) of Title 28. *See MTBE III Opinion* at 159. Judge Scheindlin denied plaintiffs' Motion for Clarification, holding that the Court had federal agent jurisdiction over certain cases and bankruptcy jurisdiction over all cases consolidated in MDL 1358. *See MTBE V Opinion* at 415.

18.    This Notice of Removal does not challenge Plaintiff's ability to pursue state law claims against individuals or entities that leak or spill gasoline into the environment. Nor do Defendants assert that federal law preempts traditional state law claims such as trespass or nuisance, grounded in the actual releases of gasoline which proximately cause environmental damage. State statutory and common law both provide well-established and tested civil remedies to parties who have suffered such injuries, to be asserted against the person or persons actually responsible for the release itself.

19.    State law claims that challenge the formulation of gasoline are removable to federal court on three grounds. First, refiners were acting at the direction of Congress and the EPA when they were directed to make RFG and had no alternative but to use MTBE, making these claims removable under federal agent jurisdiction. 28 U.S.C. §1442. Second, the cost/benefit analysis at the heart of Plaintiff's claims requires interpretation of federal law controlling gasoline formulas and assessment of federal interests in clean air and the reliable supply of reasonably priced gasoline. Third, federal law completely preempts the field of oxygenated fuel regulation, remitting to Plaintiff other federally-controlled remedies.

6

## BACKGROUND

20.    In 1977, Congress amended the CAA, by adding what has been codified as 42 U.S.C. § 7545, to federalize fuel content requirements. Section 7545 empowers the EPA to require all fuels and fuel additives to be registered with the EPA, and prohibits the sale of any fuel or fuel additive anywhere in the country that has not been registered with the EPA Administrator (the "Administrator").

21.    In 1977, Congress gave the EPA the express and exclusive authority to decide what fuels and fuel additives are sold nationwide. In § 7545(f)(1) and (3), Congress made it unlawful to sell any motor vehicle fuel or fuel additive "which is not substantially similar to any fuel or fuel additive" already on the market. Under § 7545(f)(4), Congress gave the EPA the exclusive authority to waive the prohibitions established under paragraphs (1) or (3) under certain conditions. Once a fuel is waived into commerce under § 7545(f)(4), it may be sold nationwide.

22.    The EPA has issued two § 7545(f) waivers for MTBE. The first such waiver was issued in 1979, allowing MTBE to be "introduce[d] into commerce" at concentrations of 0 to 7 percent by volume in order to enhance octane in gasoline following the ban on lead. 44 Fed. Reg. 12,242, 12,243 (Mar. 6, 1979). The EPA thereafter determined that a fuel would be "substantially similar" if it contained oxygen at up to 2.0 percent by weight. 46 Fed. Reg. 38,582 (July 28, 1981). The EPA issued the second waiver in 1988, in this case "granting a waiver for a fuel consisting of a blend of up to 15 percent [MTBE] in unleaded gasoline . . . ." 53 Fed. Reg. 33,846 (Sept. 1, 1988).

23.    In 1990, Congress again comprehensively amended the CAA. As part of those amendments, Congress created two broad-ranging programs requiring petroleum refiners to

7

blend oxygenates[4] into gasoline sold throughout much of the country:  the Oxy-Fuel Program

("OFP") and the Reformulated Gasoline ("RFG") Program.  Both programs were designed to

reduce emissions of toxic air pollutants.

    24.    In mandating the RFG Program, Congress required the EPA to promulgate

regulations regarding fuel content which:

> [s]hall require the greatest reduction in emissions of ozone forming volatile
> organic compounds . . . and emissions of toxic air pollutants . . . achievable
> through the reformulation of conventional gasoline, taking into consideration the
> cost of achieving such emissions reductions, any nonair quality and other air-
> quality related health and environmental impacts and energy requirements.

42 U.S.C. § 7545(k)(1).

    25.    Congress was well aware, when it enacted these oxygenate mandates, that only a

small number of oxygenated compounds could be blended with gasoline to achieve the minimum

oxygen levels set.

    26.    Congress also knew, when it enacted these oxygenate mandates, that the industry

would have to blend MTBE into at least some of the gasoline sold in OFP and RFG areas in

order to comply with these program requirements.  Indeed, both Congress and the EPA fully

understood that MTBE would be used in the vast majority of oxygenated gasoline sold in the

United States.  See 136 Cong. Rec. S 6383, 6384 (1990) (remarks of Sen. Daschle) ("EPA

predicts that the amendment will be met almost exclusively by MTBE").  One Congressional

estimate stated that "the MTBE market is expected to expand by more than 20 percent every year

for the next five years" as a result of the CAA amendments.  136 Cong. Rec. S. 2280, 2289

(1990) (remarks of Sen. Daschle).  See also 136 Cong. Rec. S 17773-74 (remarks of Sen.

Daschle) ("the [RFG] program ...will jointly mean that well more than 25 percent of our

---

[4] "Oxygenates" are chemical compounds – ethers or alcohols – that, when blended with gasoline, materially increase its oxygen content, enabling it to burn "cleaner" and emit fewer volatile organic compounds into the air.

Nation's gasoline will contain oxygenates, including ethanol, ETBE, MTBE, and other

oxygenates"); 136 Cong. Rec. H 12934 (remarks of Mr. Oxley) ("the oxygenated fuels program

will allow for the use of MTBE and ethanol as additives to achieve the required level of

oxygen"); 136 Cong. Rec. S 6459 (remarks of Sen. Daschle) (discussing the increased costs of

gasoline complying with CAA on the assumption that MTBE would be used).

      27.    Congress intended to affirmatively encourage the use of MTBE for these

purposes. *See* Conference Report, CAA Amendments of 1990, 1990 CAA Leg. Hist. 1451, 1787

("[t]he agreement establishes an oxygen content level of 2.7 percent in 44 cities with carbon

monoxide pollution, starting in 1992. These provisions will encourage the use of oxygen-

containing additives like ethanol and MTBE, a natural gas derivative"); 136 Cong. Rec. S 16954

(1990) (remarks of Sen. Chafee) (RFG Program "will encourage the use of oxygen-containing

additives like ethanol and MTBE"); 136 Cong. Rec. S 17514 (1990) (remarks of Sen. Heinz)

("reformulated gasoline will also encourage the use of oxygen-containing additives like ethanol

and MTBE"). In fact, Congress viewed the increased use of oxygenates like MTBE as "good for

energy security and our balance of trade, as well as the environment" because RFG with a 15%

MTBE content required 15% less gasoline. 136 Cong. Rec. S 3513 (1990) (remarks of Sen.

Daschle).

      28.    Congress even drafted the CAA Amendments to make certain MTBE could be

used to meet them. For instance, the percentage weight requirements for oxygen were amended

during the Senate's consideration of the 1990 CAA Amendments to lower the amount of oxygen

required in gasoline used in the OFP from 3.1 percent to 2.7 percent, precisely to ensure that

refiners could use MTBE to meet the oxygenate mandate requirement:

> The level of 2.7 percent was chosen in part to provide more even opportunities for
> competition between the two major oxygenates, methyl tertiary butyl ether (or

9

> MTBE), and ethyl alcohol (or ethanol). The [EPA] Administrator may not discriminate among these different oxygenates, and should encourage fair competition among them.

136 Cong. Rec. H 12848, 12859 (1990) (remarks of Mr. Sharp).

29.    Senator Daschle's comments are perhaps the most succinct evidence of Congressional intent: "We want MTBE . . . I want ETBE and ethanol and MTBE and other fuels to play a role in achieving a variety of national objectives." 136 Cong. Rec. S 2280, 2289 (1990).

30.    In short, in enacting the oxygenate mandates, Congress intended that petroleum refiners use MTBE in gasoline.

31.    Congress was also aware that efforts to comply with its new oxygenate mandates for fuel content could have a serious impact on gasoline supplies on a national, regional and local level. Consequently, Congress authorized the EPA to delay each of the OFP and RFG requirements for up to two or three years, respectively, if the Administrator determined that domestic supplies of compliant gasoline were inadequate. *See* 42 U.S.C. § 7545(k)(6)(B) & (m)(2).

32.    After the passage of the CAA Amendments in 1990, the EPA began considering regulations for the implementation of both the OFP and RFG requirements. The EPA engaged in a "regulatory-negotiation" process to develop these regulations. This process involved the active participation of the EPA and recognized stakeholders – petroleum refiners, environmental groups, etc. – in negotiations relating to the details of how each program should be implemented.

33.    In 1991, the EPA approved only the following compounds as additives to achieve the requisite oxygen content in gasoline for the OFP: MTBE, ethanol, methanol, tertiary amyl methyl ether ("TAME"), ethyl tertiary butyl ether ("ETBE"), tertiary butyl alcohol ("TBA"), and

10

diisopropyl ether ("DIPE"). *See Proposed Guidelines for Oxygenated Gasoline Credit Programs Under Section 211(m) of Clean Air Act as Amended*, 56 Fed. Reg. 31151, 31154 (July 9, 1991).

34.    The EPA began implementing the OFP requirements in 1992. Pursuant to Section 7545(m), the Administrator considered and approved changes to State Implementation Plans to require the use of oxygenated fuels in nonattainment areas for carbon monoxide.

35.    Like Congress, the EPA understood that MTBE would be "the most common oxygenating compound" used by refiners to comply with the CAA's new air emissions standards. *Approval and Promulgation of Implementation Plan*, 56 Fed. Reg. 5458, 5465 (Feb. 11, 1991).

36.    In 1994, the EPA reaffirmed its approval of MTBE by formally certifying MTBE as an acceptable oxygenate for the RFG program. *See* 40 C.F.R. § 80.46. Notably, the EPA again acknowledged that "[g]iven present and projected conditions, EPA . . . expects that MTBE and ethanol will be the most commonly used oxygenates during Phase I of the [RFG] program." *Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994). The other six oxygenates approved for use in the OFP were the only other oxygenates available for use in the RFG.

37.    RFG requirements went into effect on January 1, 1995.

38.    Thus, to refine, distribute, or market gasoline in any area subject to OFP or RFG requirements, consistent with the EPA regulations, refiners must include one of the seven approved oxygenates in gasoline at the requisite concentration.

39.    In promulgating its requirements for RFG, the EPA also specifically and expressly concluded that its regulations of fuel content preempted State law relating to the

11

content of such fuel. *See Final Rule, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline*, 59 Fed. Reg. 7716, 7732 (Feb. 16, 1994).

40.     The EPA's regulations pertaining to fuel content encompass more than 400 pages of the Code of Federal Regulations, set forth at 40 CFR Parts 79 and 80.

41.     At the time the EPA promulgated the RFG regulations, it knew of MTBE's potential to contaminate groundwater. *See Final Rule, Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Inter-Agency Committee*, 53 Fed. Reg. 10391, 10392 (Mar. 31, 1988). It also knew there was not a sufficient capacity of ethanol on a nationwide basis, nor sufficient infrastructure for ethanol, to comply with the regulation. Accordingly, the EPA expected that refiners would extensively use MTBE to comply with the oxygenate requirement. *See, e.g.,* 59 Fed. Reg. 7716, 7732; *Regulation of Fuel and Fuel Additives: Reformulated Gasoline Adjustment*, 65 Fed. Reg. 42920 (Jul. 12, 2000). To comply with the EPA's oxygenate requirements for RFG, refining companies – many of whom are defendants in this case – added MTBE to their gasoline.

42.     In addition to the comprehensive fuel content regulations, the federal government has also promulgated extensive regulations covering the transport and storage of gasoline. It has long been well understood that gasoline should not be permitted to escape into the environment. Indeed, Congress specifically amended the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6691 *et seq.*, to provide a comprehensive set of regulations governing the storage of gasoline, and an equally comprehensive set of penalties to ensure compliance with federal mandates. Section 6691b provides the EPA with broad powers to order the cleanup of leaking tanks, and § 6991e provides civil fines to tank owners that do not comply with remediation orders. The corresponding EPA regulations, 40 CFR 280.10 *et seq.*, were finalized in 1988,

12

years before the recent wave of state court lawsuits was set in motion. These regulations impose, among other things, a duty on underground storage tank owners to promptly investigate and abate the scope of any release of gasoline into the environment. Significantly, these regulations are designed to protect against *any* releases of gasoline, regardless of whether the gasoline contains MTBE or not.

## BASIS FOR REMOVAL

### Direction of Federal Officers or Agencies

43.    28 U.S.C. § 1442(a)(1) permits removal by corporations acting under the direction of federal officers or agencies. The refiners were acting at the direction of Congress and the EPA when they were required to make RFG and had no alternative but to use MTBE. Therefore, a federal directive caused the conduct about which Plaintiff complains and removal under 28 U.S.C. § 1442(a)(1) is appropriate.

44.    To remove a case under § 1442(a)(1), the removing party must establish that (1) it acted under the direction of a federal agency or officer; (2) it has a colorable federal defense; and (3) there is a sufficient causal nexus between the conduct directed by the federal officer or agency and the harm about which plaintiff complains. *See Jefferson County v. Acker,* 527 U.S. 423, 431 (1999); *MTBE III Opinion* at 154.

45.    A removing defendant meets the first requirement by "showing that the acts that form the basis for the state civil ... suit were performed pursuant to an officer's direct order or to comprehensive and detailed regulations." *MTBE III Opinion* at 154. The first prong of the removal test should be construed broadly "to achieve the protective purpose of the statute." *Id.* at 155 (*citing Agent Orange Prod. Liab. Litig.*, 2004 U.S. Dist. LEXIS 1626, *10 (E.D.N.Y. Feb.

13

9, 2004)). Defendants have alleged that they added MTBE to gasoline at the express direction of the EPA, a federal government agency, meeting the first requirement for removal. *Id.* at 156.

46.    Defendants have a legitimate federal defense: Plaintiff's claims are preempted by federal law. Gasoline containing MTBE cannot be considered defective when the EPA mandated RFG and approved and effectively required MTBE as an oxygenate in RFG. In her denial of the MDL 1358 plaintiffs' Motion to Remand, Judge Scheindlin stated that, "I have no doubt that the preemption defenses asserted by defendants in this litigation are colorable." *MTBE III Opinion* at 158. Further, Judge Scheindlin has held that preemption is a "federal" defense on which § 1442 removal may be predicated. *See In re MTBE Product Liability Litigation*, 2004 U.S. Dist. LEXIS 22100, *20-22 (S.D.N.Y. Nov. 3, 2004).

47.    There is a strong causal nexus between the EPA's oxygenate mandate and the conduct about which Plaintiff complains. The gasoline industry's use of MTBE in gasoline was a necessary, known, and expected result of congressional legislation and EPA regulations regarding the use of oxygenates in gasoline. Defendants have alleged that they are participants in a highly regulated industry and that the federal government was "intimately involved in their decision to add MTBE to gasoline" sufficiently alleging the causal nexus required for removal under the federal officer removal statute. *MTBE III Opinion*. at 158.

48.    Pursuant to the CAA and its implementing regulations, defendants are required to use oxygenates in gasoline. Further, as explained more fully above, *see* ¶¶ 20-42, *supra*, both Congress and the EPA fully understood and expected MTBE to be used in the vast majority of oxygenated gasoline sold in the United States.

14

**Bankruptcy Jurisdiction**

49.    A defendant may remove to the appropriate federal district court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 163 (1997) (quoting 28 U.S.C. § 1441(a)).

50.    28 U.S.C. § 1334(b) provides that the "district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11."

51.    On April 12, 1987, Texaco Inc. ("Texaco") filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Jointly Administered Chapter 11 Case Nos. 87-B-20142, 87-B-20143, and 87-B-20144.

52.    On March 23, 1988, the United States Bankruptcy Court for the Southern District of New York confirmed Texaco's Second Amended Joint Plan of Reorganization (the "Confirmation Order"). Pursuant to the Confirmation Order, Texaco was discharged forever from any and all claims or liabilities arising before the date of the entry of the Confirmation Order, whether or not a proof of claim was filed, and whether or not the holder of such claim accepted the Plan of Reorganization. Furthermore, pursuant to Bankruptcy Code section 524(a)(2) and the Confirmation Order, any "commencement... of any action, the employment of process, or any act to collect, recover or offset any debt discharged herein" was permanently enjoined and restrained.

53.    Additionally, pursuant to the Confirmation Order, all property of Texaco's estate and all property dealt with by the plan are free and clear of all claims and interests of creditors.

15

Furthermore, Bankruptcy Code § 1141(c) provides that, "after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors...."

54.    This action seeks recovery from Texaco for alleged claims arising prior to entry of Texaco's Confirmation Order. The Confirmation Order discharged such claims. 11 U.S.C. §§ 1141 and 524. Plaintiff's Complaint is a collateral attack upon the Confirmation Order and filed in clear violation of the injunction contained in that Order. The United States Bankruptcy Court for the Southern District of New York, which issued the Confirmation Order, has held that the pursuit of discharged claims against Texaco violates the Bankruptcy Court's Confirmation Order and the discharge injunction. *See Texaco Inc. v. Sanders (In re Texaco Inc.)*, 182 B.R. 937 (Bankr. S.D.N.Y. 1995).

55.    Here, Plaintiff alleges pre-confirmation claims that attack the integrity of Texaco's Confirmation Order, and therefore implicate Texaco's substantive federal law-based rights created by the Bankruptcy Code. Texaco's Confirmation Order and the Bankruptcy Code bar both prosecution of claims arising from pre-confirmation conduct and the claims themselves. Therefore, a matter such as this one, which implicates enforcement and construction of Texaco's Confirmation Order, is a proceeding within core federal bankruptcy jurisdiction. *See* 28 U.S.C. § 157(b) (those matters within the "core" bankruptcy jurisdiction of federal courts include "determinations as to the dischargeability of particular debts"); *Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d 1184 (7th Cir. 1993) (matter which invokes the issue of a bankruptcy discharge falls within federal bankruptcy jurisdiction); *In re National Gypsum Co.*, 118 F.3d 1056, 1064 (5th Cir. 1997) (proceeding seeking interpretation of discharge provision of confirmation order "is a core proceeding arising under title 11").

16

56.    The Bankruptcy Court for the Southern District of New York, the court that issued the Confirmation Order, is the most appropriate court to interpret the scope of its own order. Texaco reserves the right to seek transfer of venue of this case or any proceeding herein to the United States Bankruptcy Court for the Southern District of New York or to apply to the United States Bankruptcy Court for the Southern District of New York for an order enforcing its Confirmation Order and the Bankruptcy Code.

57.    Additionally, Judge Scheindlin held that the exercise of federal jurisdiction based on the court's bankruptcy jurisdiction was appropriate over all MTBE cases pending in MDL 1358 "because plaintiffs' theories of collective liability cause the defendants to be inextricably intertwined; defendants will stand or fall together." *MTBE V Opinion* at 416 ("[T]his Court has ... bankruptcy jurisdiction over all the consolidated cases.").

58.    In addition to the jurisdiction over the claims against Defendants, as set forth above, this Court has supplemental jurisdiction over the remainder of this action pursuant to 28 U.S.C. § 1367.

### Federal Question

59.    The district courts have original jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." *City of Chicago,* 522 U.S. at 163 (quoting 28 U.S.C. § 1331).

60.    Federal jurisdiction exists if the plaintiff's well-pleaded complaint establishes that federal law creates the cause of action. *See e.g., Merrell Dow Pharm., Inc. v. Thompson,* 478 U.S. 804, 808 (1986). Moreover, Federal question jurisdiction also exists if the plaintiff's right to relief necessarily depends on the resolution of a "substantial question" of federal law.

17

*Franchise Tax Bd. of the State of Calif. v. Construction Laborers Vacation Trust for So. Calif.*, 463 U.S. 1, 13 (1983).

61.     It is evident from the face of the Complaint that Plaintiff's right to relief requires the resolution of a substantial federal question.  Plaintiff attempts to challenge the use of MTBE in gasoline in several ways, including breach of warranty (Second and Third Causes of Action) and negligence (Fourth Cause of Action).  In Plaintiff's Second Cause of Action, sounding in breach of warranty, Plaintiff alleges that when Defendants placed gasoline containing MTBE into the stream of commerce, it was "defective, unreasonably dangerous, and not reasonably suited for its intended, foreseeable and ordinary transportation, storage, handling and uses. . . ." (Complaint ¶ 190).

62.     On its face, the Complaint attempts to assert that the use of MTBE in gasoline constitutes an inherent design defect.  In order to prevail under Massachusetts law on Plaintiff's claim of breach of warranty due to design defect, Plaintiff must demonstrate: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the feasibility of a safer alternative design; the financial cost of an improved design; and the adverse consequences to the product and to the consumer that would result from an alternative design. *See Colter v. Barber-Greene, Co.*, 525 N.E.2d 1305, 1310 (Mass. 1988), *citing Back v. Wickes Corp.*, 378 N.E.2d 964, 970 (Mass. 1978).  Plaintiff's burden is to prove that "an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery" exists. *Colter*, 525 N.E.2d at 1344, *citing Uloth v. City of Tank Corp.*, 384 N.E.2d 1188 (Mass. 1978).  Similarly, to sustain its negligence action, Plaintiff has the burden of proving that Defendants failed to exercise reasonable care to eliminate avoidable or foreseeable dangers to the user. *See Wasylow v. Glock, Inc.*, 975 F.Supp. 370, 379 (D. Mass.

18

1996), *citing Uloth*, 384 N.E.2d at 1192-93. Plaintiff could not reach the jury without showing "an available design modification which would reduce the risk without undue cost or interference" with performance. *Id.* The risk-utility analysis required under this analysis pits the wisdom of Congress and the EPA against the deliberations of a Massachusetts jury.[5]

63.    Plaintiff's *prima facie* case requires proof that the existing design of gasoline is unreasonably dangerous and that the presence of a practicable alternative exists which will satisfy the RFG program requirements.

64.    Plaintiff acknowledges that it must prove the relative risks and utilities of gasoline containing MTBE, including the feasibility of alternatives, by its allegation that "MTBE was not the only viable option to achieve higher octane in gasoline." (Complaint ¶ 70).

65.    The EPA promulgates the only standards and specifications for gasoline under the OFP and RFG programs. These are federal regulations that Plaintiff relies on repeatedly in its Complaint.

66.    Specifically, among the allegations incorporated into the breach of warranty claim, Plaintiff alleges: "MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected a choice and preference of Defendants...." (Complaint ¶ 70). "The Clean Air Act requires the use of some oxygenate, but it *does not require* that oxygenate to be MTBE." (Complaint ¶ 140) (emphasis added) and, "[s]afer, more environmentally sound alternatives were available." (Complaint ¶ 141). Thus, even Plaintiff acknowledges that its

---

[5] With respect to the duty to warn of dangerous/defective products, the Massachusetts Supreme Judicial Court has adopted the principles set forth in the Restatement (Third) of Torts Products Liability § 2(c). *See Vassallo v. Baxter Healthcare Corp.,* 696 N.E.2d 909, 923 (Mass. 1998). The Third Restatement discusses the rationale for its allocation of responsibility in such cases, and states that "risk-utility" balancing is necessary to evaluation such alleged defects. Requiring a Massachusetts jury to decide the "various trade-offs [that] need to be considered" risks upsetting Congress and the EPA's policy decisions. *See Restatement (Third) of Torts: Products Liability § 2, cmt. a.*

claims require resolution of a substantial federal question – whether practical alternatives to MTBE existed that would still meet the standards set forth by the EPA in its regulatory scheme.

67.    Plaintiff's claim that Defendants negligently designed and formulated gasoline with MTBE also raises federal questions.  Under Massachusetts law, to sustain their claim of negligence, Plaintiff must establish three elements:  (1) the identification of a legal duty of the defendant to the plaintiff;  (2) a breach of that duty;  and (3) injury to the plaintiff proximately caused by the breach.  *See Wasylow*, 975 F.Supp at 376.

68.    Here, the EPA promulgates standards for gasoline and its additives.  Plaintiff pled, and will have to prove, that Defendants breached their duty of care in formulating gasoline by choosing to add MTBE and by various other acts and omissions.  (Complaint ¶¶ 209-212).  Plaintiff's sole means to prove the standard itself, as well as that Defendants deviated from it, is by resorting to and construing the federal CAA and its implementing regulations.

69.    In sum, Plaintiff has asked the Superior Court of Suffolk County, Massachusetts to construe a complicated web of federal statutes and implementing regulations that reflects the EPA's own balancing and conclusions.  That court's conclusions could easily undermine the policy choices reflected in the EPA's initial waiver of MTBE into commerce and its subsequent registration of MTBE as one of the few oxygenates that could be used to comply with OFP and RFG requirements.[6]

---

[6] It is beyond dispute that the choice of gasoline components involves tradeoffs.  Each of the approved oxygenates share, to varying degrees, the very characteristics of MTBE of which Plaintiff now complains.  And certain oxygenates other than MTBE pose additional tradeoffs and risks.  If state product liability claims such as those brought by Plaintiff are permitted to coexist with federal fuel content regulations, there is no legal reason why comparable claims cannot be asserted against Defendants and others for using any of the oxygenates approved to comply with federal fuel content requirements.  Thus, Defendants, although required by federal law to blend an oxygenate into gasoline, have had and will have no means of determining which oxygenates they may use without subjecting themselves to the uncertainties of what is, in effect, state-by-state fuel content regulation through individual tort actions for adding MTBE or adding any of the other alternative oxygenates.

**Preemption**

70.    Removal is also appropriate where, as here, the federal government has completely preempted the field. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). The Clean Air Act expressly provides "no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine" if the EPA "has prescribed...a control or prohibition applicable to such characteristic or component of a fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by [EPA.]" The EPA has clearly adopted a "control or prohibition" with respect to oxygenated fuels, *see* 40 C.F.R. §80.78 ("controls and prohibitions on reformulated gasoline"). Because Plaintiff's tort claims would create a duty not to use MTBE and hence, would be a "control or prohibition" that is "not identical to the prohibition or control prescribed by [EPA]," these legal claims are preempted just as state regulations would be. 42 U.S.C. § 7545(c)(4).

71.    Consistent with Congress' express intent to completely preempt all State regulation of fuel content, and recognizing the national scope of gasoline distribution, the EPA has announced its intent to completely preempt State regulation of motor vehicle fuel content. In promulgating its regulations pursuant to the RFG program, the EPA stated as follows:

> The regulations proposed here will affect virtually all of the gasoline sold in the United States. As opposed to commodities that are produced and sold in the same area of the country, gasoline produced in one area is often distributed to other areas. The national scope of gasoline production and distribution suggests that federal rule should preempt State action to avoid an inefficient patchwork of potentially conflicting regulations. Indeed, Congress provided in the 1977 Amendments to the CAA that federal fuels regulations preempt non-identical State controls except under certain specified circumstances. EPA believes that the same approach to federal preemption is desirable for the reformulated gasoline and anti-dumping programs.

21

59 Fed. Reg. 7716, 7809.

72.    Plaintiff's purported state tort claims challenging the design of gasoline is really a federal claim asserting that the EPA's cost-benefit analysis with respect to fuel content – grounded in the EPA's technical expertise and nationally focused judgment – does not adequately protect the environment. Congress unambiguously expressed that the EPA has exclusive authority to determine the efficacy of fuel additives with respect to air pollution. *See* 42 U.S.C. § 7545(c)(4)(A).

73.    Following promulgation of the RFG regulations in 1994, Plaintiff did not challenge the EPA's exercise of discretion to preempt the entire field of motor vehicle fuel content, although they were free to do so under the exclusive terms for such review set forth in 42 U.S.C. § 7607(b)(1). Accordingly, state court litigants cannot now collaterally challenge the EPA's determination on preemption in the guise of state tort actions.

74.    The Complaint specifically requests that the Superior Court of Suffolk County, Massachusetts supplant the judgment and conclusions of Congress and the EPA regarding fuel content with its own. It seeks to interfere with an area that Congress has expressed a clear intent to carve out for federal dominance, given the national reach of the gasoline transport and delivery system, and the effects of these products on the nation as a whole, not just on the citizens or environment of a particular state. Indeed, Plaintiff's claim presents precisely the issue that Congress placed within the sole purview of the EPA, when it gave the EPA the exclusive authority to determine whether a fuel or fuel additive could be introduced into commerce, and again when it required the agency to certify oxygenates for the RFG program, "taking into consideration the cost of achieving such emission reductions, *any nonair-quality* and other air-quality *environmental impacts* and energy requirements." 42 U.S.C. § 7545(k)(1) (emphasis

22

added).  Federal law sets up a specific framework that the EPA must use in balancing these various factors.  Thus, Plaintiff's state law tort claim is in fact covered by the federal regimen and was remitted to the EPA for its determination.

75.    If various state courts in more than seventeen different states in more than seventy lawsuits determined the question of federal preemption, the result would be a landslide of legal and factual outcomes that could be at odds not only with the Congressional intent and the EPA's decisions based on its interpretation of that intent, but at odds with one another.  Each state has its own standards for what constitutes a dangerous or defective product, its own rules for the type of balancing a manufacturer has to undertake to supply its products in that state, and its own factors for evaluating the hazards to its citizenry.  Within each state (or even within various subdivisions within the same state) judges can apply those standards differently or juries can draw different conclusions based on their understanding of the balancing tests.  Conceivably, the gasoline industry could be held liable in Massachusetts for its decision to add MTBE, exonerated in Indiana, fined in Virginia and subjected to substantial damages in California.  Such disparate results would eviscerate the carefully constructed federal scheme and the industry's ability to rely upon Congressional intent to both provide and maintain a consistent supply of gasoline and to protect the nation's environment and its citizens.[7]

---

[7] Recognizing how imperative uniformity is to the national distribution system, Congress did not even want to risk inconsistent results among the federal circuits with respect to judicial review of fuel content regulations. Accordingly, it vested exclusive jurisdiction in the D.C. Circuit Court of Appeals. *See* 42 U.S.C. § 7607(b).

WHEREFORE, Defendants hereby remove to this Court the action captioned *City of Lowell v. Amerada Hess Corporation, et al.* case no. 04-5654, from the Superior Court Department Suffolk County, Massachusetts.

Respectfully submitted,

EXXON MOBIL CHEMICAL COMPANY
EXXONMOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION,
MOBIL CORPORATION

By: _____
Anthony A. Bongiorno (BBO #554356)
Melissa L. Nott (BBO #654546)
McDERMOTT WILL & EMERY LLP
28 State Street
Boston, Massachusetts 02109
(617) 535-4000

and

Peter John Sacripanti
James A. Pardo
McDERMOTT WILL & EMERY LLP
50 Rockefeller Plaza
New York, New York 10020
(212) 547-5400

Dated: January 28, 2005

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused a copy of the within Notice of Removal to be sent by express mail to Plaintiff's counsel and by electronic mail to all Defendants' counsel on the attached service list.

Dated: January 28, 2005        _____

24

Respectfully submitted,

EQUILON ENTERPRISES LLC
MOTIVA ENTERPRISES LLC
SHELL OIL COMPANY
SHELL OIL PRODUCTS COMPANY
SHELL OIL PRODUCTS COMPANY, LLC
SHELL PETROLEUM, INC.
SHELL TRADING (US) COMPANY
TMR COMPANY

By: _William L. Parker_____
One of Their Attorneys

Dated: January 24, 2005

William L. Parker
 BBO No. 549839
Fitzhugh, Parker & Alvaro LLP
155 Federal Street, Suite 1700
Boston, Massachusetts  02110
Tel. 617-695-2330
Fax 617-695-2335

Respectfully submitted,

CHEVRONTEXACO CORPORATION
CHEVRON U.S.A., INC.
TEXACO INC.

By: _William L. Parker_
One of Their Attorneys

Dated: January 25, 2005

William L. Parker
BBO No. 549839
Fitzhugh, Parker & Alvaro LLP
155 Federal Street, Suite 1700
Boston, Massachusetts  02110
Tel. 617-695-2330
Fax 617-695-2335

Respectfully submitted,

_____
Andrew G. Wailgum BBO #631965
MURTHA CULLINA LLP
99 High Street
20th Floor
Boston, MA  02110
617-457-4000
617-482-3868 (Facsimile)

J. Andrew Langan
Mark S. Lillie
R. Chris Heck
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601-6636
312-861-2000
312-861-2200 (Facsimile)

Attorney for Defendants:
Atlantic Richfield Company; BP Amoco Chemical
Company; BP Products North America Inc.

Date:  January 20, 2005                    CITGO Petroleum Corporation

                                           _____

                                           J. Owen Todd
                                           Lisa G. Arrowood
                                           Kathleen Genova
                                           Todd & Weld LLP
                                           28 State Street
                                           Boston, MA 02109
                                           Phone:  (617) 720-2626
                                           Fax:  (617) 227-5777

                                                        -and-

                                           Nathan P. Eimer
                                           Pamela R. Hanebutt
                                           Lisa S. Meyer
                                           EIMER STAHL KLEVORN & SOLBERG LLP
                                           224 S. Michigan Avenue, Suite 1100
                                           Chicago, IL 60604
                                           Phone:  (312) 660-7600
                                           Fax:  (312) 692-1718

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## 1. (a) PLAINTIFFS

CITY OF LOWELL, MASSACHUSETTS

**DEFENDANTS**

AMERADA HESS CORPORATION, et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  **Middlesex, MA**
(EXCEPT IN U.S. PLAINTIFF CASES).

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(C)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Richard M. Sandman (BBO # 440940)

RODMAN, RODMAN & SANDMAN, PC
442 Main Street, Suite 300
Malden, MA 02148-5122
Tel: 781-322-3720

ATTORNEYS (IF KNOWN)
Attorneys for ExxonMobil Chemical Co., ExxonMobil Corp., ExxonMobil Oil
Corp., Mobil Corp.
Anthony A. Bongiorno (BBO #554356)
Melissa L. Nott (BBO #654546)
McDermott Will & Emery LLP
28 State St.
Boston, MA 02109  Tel: 617.535.4000

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  U.S. Government
     Plaintiff

☐ 2  U.S. Government
     Defendant

**X** 3  Federal Question
     (U.S. Government Not a Party)

☐ 4  Diversity
     (Indicate Citizenship of Parties
     in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                AND ONE BOX FOR DEFENDANT

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

05cv10175 MLW

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | **X** 893 Environmental Matters |
| | | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS:** | Security Act | or Defendant) | Under Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS - Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  Original
     Proceeding

**X** 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     another district
     (specify)

☐ 6  Multidistrict
     Litigation

☐ 7  Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.) 28 U.S.C. § 1441(a).  Plaintiff alleges various environmental injuries stemming from Defendants' manufacture and/or use in some gasoline products of an oxygenating agent known as MTBE.  MTBE has been approved for use in gasoline by the EPA.  Plaintiff's proposed claims implicate substantial questions under the Clean Air Act and related EPA regulations.

## VII. REQUESTED IN     ☐ CHECK IF THIS IS A CLASS ACTION     DEMAND $     CHECK YES only if demanded in complaint:
## COMPLAINT:          ☐ UNDER F.R.C.P. 23                                    JURY DEMAND  **X** YES  ☐ NO

## VIII. RELATED CASE(S) (See instructions)
## IF ANY                     JUDGE  Shira Scheindlin (S.D.N.Y.)   *In re MTBE*   DOCKET NUMBER  Master File No. 1:00-1898

DATE  1/28/05     SIGNATURE OF ATTORNEY OF RECORD  *Melissa Nott*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

| CIVIL ACTION COVER SHEET | DOCKET NO (S) 04-5654 | Trial Court of Massachusetts Superior Court Department County: Suffolk |
|---|---|---|

| PLAINTIFF(S) City of Lowell | DEFENDANT(S) Amerada Hess Corporation, et al. |
|---|---|

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Richard M. Sandman, Esq. RODMAN, RODMAN & SANDMAN, P.C. (781)322-3720                442 MAIN STREET                                    SUITE 300 Board of Bar Overseers number: 440940        MALDEN, MA 02148-5122 | ATTORNEY (If known) |
|---|---|

### Origin code and track designation

Place an x in one box only:

- [x] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P.60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B21 | Environmental | ( A ) | ( X )Yes    ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
See attached
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . $
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . $
3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . $
4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . $
5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . $
Subtotal $ . . . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . . . . . $
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . . . . . . $
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $
F. Other documented items of damages (describe)
$
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

$
TOTAL $ . . . . . . . . . . . .

#### CONTRACT CLAIMS
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):

TOTAL $. . . . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record    Richard Senta                    DATE: 12/30/04

AOTC-6 mic005-11/99
A O S C 1-2000

Supplement to Civil Action Cover Sheet – Suffolk Superior Court

Civil Action No.: _____

Case:        City of Lowell
             v.
             Amerada Hess Corporation, et al.

Case Type:   B21 – Environmental
Date:        December 30, 2004

## Statement of Damages – Tort Claim

Parts C & F:  Property Damage and Other Items of Damage

Plaintiff is a Public Water Provider under Massachusetts law whose public water supply has been contaminated by the gasoline additive MTBE. Plaintiff claims that the Defendants manufactured, supplied, and/or added MTBE to the gasoline that was shipped to and arrived in Boston, Massachusetts, and in other Massachusetts locations when they knew or should have known of MTBE's propensity to contaminate water supplies. Plaintiff also alleges that MTBE is a defective product and that the Defendants did not adequately warn of its dangers and breached warranties to the Plaintiff.

Plaintiff's damages include reimbursement for past expenditures for testing, monitoring, and inspecting its water supply. Further, Plaintiff claims damages for the costs of remediation of its water supply including, but not limited to, treatment plants and filters. Finally, Plaintiff claims damages for future anticipated expenditures including, but not limited to, testing, monitoring, inspecting and remediation of its water supply.

Total Damages Claimed on Behalf of Plaintiff:                    $50,000,000.00

*1*

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                          SUPERIOR COURT
                                                     CIVIL ACTION NO.:


CITY OF LOWELL,

        Plaintiff,

    vs.                                          04-5654

Amerada Hess Corporation
American Refining Group, Inc.
Atlantic Richfield Company, individually and
      doing business as ARCO Products
      Company (f/k/a Arco Petroleum Co.),
      and also known as ARCO
Atofina Petrochemicals, Inc., (individually and
      as successor-by-merger to Fina, Inc.)
BP Amoco Chemical Company, individually and
      formerly known as Amoco Chemical Company
BP Products North America, Inc., individually and
      as successor-by-merger to Amoco Oil Company and
      BP Exploration and Oil Inc. (successor-by-merger
      to BP North America Inc.)
Chelsea Sandwich LLC
ChevronTexaco Corporation, individually and as
      successor-in-interest to Chevron Corporation
      and as successor-in-interest to Texaco, Inc.
Chevron U.S.A., Inc., individually and formerly known
      as Gulf Oil Corp. (d/b/a Chevron Products
      Company, d/b/a Chevron Chemical Company)
Citgo Petroleum Corporation
Citgo Refining and Chemical Company, LP
Coastal Oil New England, Inc.
Colorado Refining Company
ConocoPhillips Company f/k/a Phillips Petroleum
      Company, individually and as successor-in-
      interest to Tosco Corporation and
      d/b/a Phillips 66 Company
Cumberland Farms, Incorporated

MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE
2004 DEC 30 P 12: 54
SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

**PLAINTIFFS DEMAND
A TRIAL BY JURY**

El Paso Merchant Energy-Petroleum Company,
    individually and formerly known as Coastal
    Refining and Marketing, Inc. and formerly
    known as Coastal States Trading, Inc.
Equilon Enterprises, LLC, d/b/a Shell Oil Products US,
    individually and as successor-by-merger to
    Equiva Services LLC
Equistar Chemicals, L.P.
ExxonMobil Chemical Company, Inc., individually and
    formerly known as Mobil Chemical Company Inc.
Exxon Mobil Corporation, f/k/a Exxon Corporation
    (and d/b/a ExxonMobil Refining and Supply Company,
    Exxon Chemical U.S.A. and ExxonMobil Chemical
    Corporation)
ExxonMobil Oil Corporation
FHR/GP, LLC, (individually and as general
    partner of Flint Hills Resources, LP)
Flint Hills Resources, LP (f/k/a Koch Petroleum Group, LP)
Giant Yorktown, Inc.
Global Companies, LLC,
Global Montello Group, LLC
Global Petroleum Corporation
Gulf Oil Limited Partnership formerly known
    as Catamount Petroleum Limited Partnership
Lyondell Chemical Company, individually
    and formerly known as Lyondell
    Petrochemical Company and formerly known
    as Arco Chemical Company
Lyondell-Citgo Refining, L.P.
Lyondell Petrochemical GP, Inc., (individually and as
    general partner of Equistar Chemicals, LP)
Mobil Corporation
Motiva Enterprises, LLC, individually and
    formerly known as Star Enterprises LLC
PDV Midwest Refining
Placid Refining Co., LLC
The Premcor Refining Group, Inc., individually
    and formerly known as Clark Refining
Shell Oil Company
Shell Oil Products Company
Shell Oil Products Company, LLC
Shell Petroleum, Inc.
Shell Trading (US) Company, individually and

formerly known as **Equiva Trading**
    **Company**, and also known as **Stusco**
**Sunoco, Inc.**, individually and formerly known
    as **Sun Oil Company**, and formerly known
    as **Sun Company, Inc.**, and as sucessor-in-interest
    to **Coastal Eagle Point Oil Company**
**Sunoco, Inc. (R&M)**, individually and formerly
    known as **Sun Refining and Marketing**
    **Company** and formerly known as **Sun**
    **Company Inc. (R&M)**
**Texaco, Inc.**
**Texaco Refining & Marketing (East), Inc.**
**TMR Company** (f/k/a Texaco Refining and Marketing, Inc.
    Individually and as successor-by-merger to **TRME**
    **Company** (f/k/a **Texaco Refining and Marketing**
    **(East), Inc.**))
**Tosco Corporation**, individually and as predecessor-
    in-interest to **ConocoPhillips Company**, and
    also known as **Tosco Refining Company**, and
    also known as **Tosco Marketing Company**
**TPI Petroleum, Inc.**
**Union Oil Company of California** d/b/a **UNOCAL**
**Unocal Corporation**, individually and formerly
    known as **Union Oil Company of California**
**Valero Energy Corporation**
**Valero Marketing and Supply Company**
**Valero Refining Complany**
**Valero Refining and Marketing Company**

        Defendants.
--------------------------------------------------------X

## NATURE OF THE CASE

1.        This case involves Massachusetts' most precious natural resource — water.
Throughout this great state, public water is contaminated by methyl tertiary butyl ether
("MTBE"").  As used herein, the term "MTBE" shall include all its degradation products,
such as tert-butyl alcohol ("TBA").  MTBE is a gasoline additive needlessly and recklessly
added to gasoline in Massachusetts.  MTBE is highly soluble in water and does not readily

biodegrade. MTBE is a possible human carcinogen, a known animal carcinogen, and even very small amounts impart a foul taste and odor to water. Despite knowing that MTBE has unique characteristics in water which allow it to contaminate water sources never seen before its addition to gasoline, these Defendants chose to make it the second largest chemical manufactured in the United States. In doing so, these Defendants have unleashed an unprecedented assault on the water supplied to the citizens of Massachusetts

## PARTIES

### Plaintiff

2.        Plaintiff is a public water provider organized under the laws of the Commonwealth of Massachusetts. Plaintiff bears the responsibility of owning and operating public water systems.

3.        Plaintiff is a city located in northeastern Massachusetts and is a public water provider pursuant to the laws of the Commonwealth of Massachusetts. Plaintiff bears the responsibility of owning and operating a public water system and is responsible for providing clean, pure and uncontaminated water of the highest quality to its citizens. Plaintiff obtains its water from the Merrimack River. Plaintiff has experienced actual MTBE contamination of its water.

### Defendants

4.        Defendants do business in Massachusetts as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE.

5.        At all times relevant to this litigation, Defendants engaged in one or more phases

- 4 -

of the petroleum business, including: designing and manufacturing MTBE and adding it to gasoline at the refinery; marketing gasoline containing MTBE in Massachusetts; selling gasoline containing MTBE in Massachusetts; and/or distributing gasoline containing MTBE in Massachusetts.

6.　　　　Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

7.　　　　When the term "Defendants" is used alone, it refers to all Defendants named herein jointly and severally.

8.　　　　When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors,agents,employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

9.　　　　**Amerada Hess Corporation** is a Delaware corporation with its principal place of business at 1185 Avenue of the Americas, 40th Floor, New York, New York 10036, doing business in the Commonwealth of Massachusetts. Amerada Hess Corporation may be served with process through CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

10.　　　　**America Refining Group, Inc.,** doing business in the Commonwealth of Massachusetts, is a corporation with its principal of business at 100 4 Falls Corporate

Center, West Conshohocken, PA 19428. America Refining Group, Inc., may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

11  **Atlantic Richfield Company**, individually and doing business as ARCO Products Company (f/k/a Arco Petroleum Co.), and also known as ARCO, a subsidiary of BP America, Inc., is a Delaware corporation with its principal place of business at 4 Center Pointe Drive, La Palma, California 90623, doing business in the Commonwealth of Massachusetts. Atlantic Richfield Company may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

12  **Atofina Petrochemicals, Inc., (individually and as successor-by-merger to Fina, Inc.)**, doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of Massachusetts, One Ashburton Place, 17th Floor, Boston, MA 02108, at its principal of business at 15710 John F. Kennedy Blvd., Houston, TX 77032.

13.  **BP Amoco Chemical Company**, individually and formerly known as Amoco Chemical Company, a subsidiary of BP Corporation North America, Inc., is a Delaware corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois 60601, doing business in the Commonwealth of Massachusetts. BP Amoco Chemical Company may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

14.  **BP Products North America, Inc.**, individually and as successor-by-merger to **Amoco Oil Company and BP Exploration and Oil Inc. (successor-by-merger to BP**

North America Inc.), is a Maryland corporation with its principal place of business at 200 East Randolph Drive, Chicago, Illinois 60601, doing business in the Commonwealth of Massachusetts. BP Products North America, Inc. may be served with process through its registered agent, Prentice-Hall Corporation System, 84 State Street, Boston, Massachusetts 02109.

15.       **Chelsea Sandwich LLC** is a Delaware limited liability company with its principal place of business at 800 South St. Waltham, Massachusetts 02254-9161, doing business in the Commonwealth of Massachusetts. Chelsea Sandwich LLC may be served with process through its registered agent, Edward J. Faneuil, Global Petroleum Corporation, 800 South Street, Waltham, Massachusetts 02254.

16.       **ChevronTexaco Corporation, individually and as successor-in-interest to Chevron Corporation and as successor-in-interest to Texaco, Inc.**, is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, doing business in the Commonwealth of Massachusetts. ChevronTexaco Corporation may be served with process through the Secretary of State, Commonwealth of Massachusetts, Corporations Division, One Ashburton Place, 17th Floor, Boston, Massachusetts 02108, and through its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583.

17.       **Chevron U.S.A., Inc., individually and formerly known as Gulf Oil Corp. (d/b/a Chevron Products Company, d/b/a Chevron Chemical Company)**, is a Pennsylvania corporation with its principal place of business at 6001 Bollinger Road, San Ramon, California 94583, doing business in the Commonwealth of Massachusetts. Chevron

U.S.A., Inc. may be served with process through its registered agent, Prentice-Hall Corporation System, 84 State Street, Boston, Massachusetts 02109.

18.    **Citgo Petroleum Corporation** is a Delaware corporation with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the Commonwealth of Massachusetts. Citgo Petroleum Corporation may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

19.    **Citgo Refining and Chemical Company, LP,** a subsidiary of Citgo Investment Company, is an Oklahoma limited partnership with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136, doing business in the Commonwealth of Massachusetts. Citgo Refining and Chemicals Company, LP may be served with process through the Secretary of State, Commonwealth of Massachusetts, Corporations Division, One Ashburton Place. 17th Floor, Boston, Massachusetts 02108, and through its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma 74136.

20.    **Coastal Oil New England, Inc.** is a Massachusetts corporation with its principal place of business at 222 Lee Burbank Avenue, Revere, Massachusetts 02151, doing business in the Commonwealth of Massachusetts. Coastal Oil New England, Inc. may be served with process through its registered agent, CT Corporation System, 2 Oliver Street, Boston, Massachusetts 02109.

21.    **Colorado Refining Company,** doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of

Massachusetts, One Ashburton Place, 17th Floor, Boston, MA 02108, at its principal of business at One Valero Place, San Antonio, TX 78212.

22.    **ConocoPhillips Company, f/k/a Phillips Petroleum Company, individually and as successor-in-interest to Tosco Corporation, and d/b/a Phillips 66 Company,** is a Delaware corporation with its principal place of business at 600 North Dairy Ashford Road, Houston, Texas 7709, doing business in the Commonwealth of Massachusetts. ConocoPhillips Company may be served with process through its registered agent, U.S. Corporation Company, 84 State Street, Boston, Massachusetts 02108.

23.    **Cumberland Farms, Incorporated** is a Delaware corporation with its principal place of business at 777 Dedham Street, Canton, Massachusetts 020201, doing business in the Commonwealth of Massachusetts. Cumberland Farms, Incorporated may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

24.    **El Paso Merchant Energy-Petroleum Company, individually and formerly known as Coastal Refining and Marketing, Inc. and formerly known as Coastal States Trading, Inc.,** is a Delaware corporation with its principal place of business at 1001 Louisiana Street, Houston, Texas 77002, doing business in the Commonwealth of Massachusetts. El Paso Merchant Energy-Petroleum Company may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

25.    **Equilon Enterprises, LLC, d/b/a Shell Oil Products US, individually and as successor-by-merger to Equiva Services LLC,** is a Delaware limited liability company

with its principal place of business at 1100 Louisiana Street, Suite 2200, Houston, Texas 77002, doing business in the Commonwealth of Massachusetts. Equilon Enterprises, LLC may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

26      **Equistar Chemicals, L.P.,** doing business in the Commonwealth of Massachusetts, may be served with process via its registered agent, CT Corporation System, 101 Federal St., Boston, MA 02110.

27      **ExxonMobil Chemical Company, Inc., individually and formerly known as Mobil Chemical Company Inc.,** a subsidiary of ExxonMobil Oil Corporation, is a Delaware corporation with its principal place of business at 13501 Katy Freeway, Houston, Texas 77079. doing business in the Commonwealth of Massachusetts. ExxonMobil Chemical Company, Inc. may be served with process through the Secretary of State, Commonwealth of Massachusetts, Corporations Division, One Ashburton Place, 17th Floor, Boston. Massachusetts 02108, and through its principal place of business at 13501 Katy Freeway, Houston, Texas 77079.

28      **Exxon Mobil Corporation, f/k/a Exxon Corporation (and d/b/a ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A. and ExxonMobil Chemical Corporation),** is a New Jersey corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039, doing business in the Commonwealth of Massachusetts. ExxonMobil Corporation may be served with process through its registered agent, Corporation Service Company, 84 State Street, Boston, Massachusetts 02109.

29.     **ExxonMobil Oil Corporation,** is a New York corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039, doing business in the Commonwealth of Massachusetts. ExxonMobil Oil Corporation may be served with process through its registered agent, Prentice-Hall Corporation System, Inc., 84 State Street, Boston, Massachusetts 02109.

30.     **FHR/GP, LLC, (individually and as general partner of Flint Hills Resources, LP),** may be served with process via its registered agent, Corporation Service Co., 84 State Street, Boston, MA 12109.

31.     **Flint Hills Resources, LP (f/k/a Petroleum Group, LP)** doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of Massachusetts, One Ashburton Place, 17th Floor, Boston, MA 02108, at its principal of business at 4111 E. 37th Street N., Wichita, KS 67220.

32.     **Giant Yorktown, Inc.,** doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of Massachusetts, State House, One Ashburton Place, 17th Floor, Boston, MA 02108, at its principal of business at 23733 Scottsdale Rd., Scottsdale, AZ 85255.

33.     **Global Companies, LLC,** a subsidiary of Global Petroleum Corporation, is a Delaware limited liability company with its principal place of business at 800 South Street, Waltham, Massachusetts 02453, doing business in the Commonwealth of Massachusetts. Global Companies, LLC may be served with process through its registered agent, Edward J. Faneuil, c/o Global Petroleum Corp., 800 South Street, Waltham, Massachusetts 02453.

34.        **Global Montello Group, LLC,** is a Delaware limited liability company with its principal place of business at 800 South Street, Waltham, Massachusetts 02453, doing business in the Commonwealth of Massachusetts.  Global Montello Group, LLC may be served with process through its registered agent, Edward J. Faneuil, c/o Global Petroleum Corp., 800 South Street, Waltham, Massachusetts 02453

35        **Global Petroleum Corporation** is a Massachusetts corporation with its principal place of business at 800 South Street, Waltham, Massachusetts 02453, and conducts business in the Commonwealth of Massachusetts.  Global Petroleum Corporation may be served with process through the Secretary of State, Commonwealth of Massachusetts, Corporations Division, One Ashburton Place, 17th Floor, Boston, Massachusetts 02108, and through its principal place of business at 800 South Street, Waltham, Massachusetts 02453

36.        **Gulf   Oil   Limited   Partnership   f/k/a   Catamount   Petroleum   Limited Partnership** is a Delaware limited partnership with its principal place of business at 90 Everett Avenue, Chelsea, Massachusetts 02150, doing business in the Commonwealth of Massachusetts.  Gulf Oil LP may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

37.        **Lyondell Chemical Company, individually and formerly known as Lyondell Petrochemical Company and formerly known as Arco Chemical Company,** is a Delaware corporation with its principal place of business at 1221 McKinney Street, Suite 700, Houston, Texas 77010, doing business in the Commonwealth of Massachusetts. Lyondell Chemical Company may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

38.     **Lyondell-Citgo Refining, LP,** doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of Massachusetts, One Ashburton Place, 17th Floor, Boston, MA 02108, at its principal of business at 12000 Lawndale, Houston, TX 77017

39.     **Lyondell Petrochemical GP, Inc., (individually and as general partner of Equistar     Chemicals, LP)** doing business in the Commonwealth of Massachusetts, may be served     with process via the Secretary of State, Commonwealth of Massachusetts, State House,    Room 337, Boston, MA 02133, at its principal of business at 101 Federal St., Boston, MA   02110.

40.     **Mobil Corporation,** a subsidiary of ExxonMobil Corporation, is a Nevada corporation with its principal place of business 5959 Las Colinas Boulevard, Irving, Texas 75039, doing  business in the Commonwealth of Massachusetts. Mobil Corporation may be served with process through its registered agent, Prentice-Hall Corp. System. 84 State Street, Boston, Massachusetts 02109.

41.     **Motiva Enterprises, LLC, individually and formerly known as Star Enterprises LLC,** is a Delaware limited liability company with its principal place of business at 1100 Louisiana Street, Suite 1072, Houston, Texas 77002, doing business in the Commonwealth of Massachusetts. Motiva Enterprises, LLC may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

42.     **PDV Midwest Refining,** doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of Massachusetts,

One Ashburton Place, 17th Floor, Boston, MA 02108, at its principal of business at 13l5   &

New Ave., Bolingbrook, IL 60439.

43      **Placid Refining Co., LLC,** doing business in the Commonwealth of

Massachusetts, may be served with process via the Secretary of State, Commonwealth

of Massachusetts, One Ashburton Place, 17th Floor, Boston, MA 02108, at its principal of

business at 1601 Elm St., Suite 3900, Dallas, TX 75201.

44      **The Premcor Refining Group, Inc., individually and formerly known as**

**Clark Refining,** is a Delaware corporation with its principal place of business at 8182

Maryland Avenue, St. Louis, Missouri 63105, doing business in the Commonwealth of

Massachusetts.  The Premcor Refining Group, Inc. may be served with process through its

registered agent, CT Corporation System, 101 Federal Street, Boston. Massachusetts 02110.

45      **Shell Oil Company** is a Delaware corporation with its principal place of business

at 910 Louisiana Street, Houston, Texas 77002, doing business in the Commonwealth of

Massachusetts.  Shell Oil Company may be served with process through its registered

agent, Corporation Service Company, 84 State Street, Boston, Massachusetts 02109.

46      **Shell Oil Products Company** is a Delaware corporation with its principal place of

business at One Shell Place, Houston. Texas 77002. doing business in the Commonwealth

of Massachusetts.  Shell Oil Products Company may be served with process through its

registered agent, Prentice-Hall Corporation System, Inc., 84 State Street, Boston,

Massachusetts 02109.

47.     **Shell Oil Products Company, LLC** is a Delaware limited liability company with

its principal place of business 910 Louisiana Street, Houston, Texas 77002, doing business in the Commonwealth of Massachusetts. Shell Oil Products Company, LLC may be served with process through the registered agent, Corporation Service Company, 84 State Street, Boston, Massachusetts 02109.

48.        **Shell Petroleum, Inc.,** which owns Shell Oil Company, is a Delaware corporation with its principal place of business at 910 Louisiana Street, Houston, Texas 77002, doing business in the Commonwealth of Massachusetts. Shell Petroleum, Inc. may be served with process through the Secretary of State, Commonwealth of Massachusetts, Corporations Division, One Ashburton Place, 17th Floor, Boston, Massachusetts 02108, and through its principal place of business at 910 Louisiana Street, Houston, Texas 77002

49.        **Shell Trading (US) Company, individually and formerly known as Equiva Trading Company, and also known as Stusco,** is a Delaware corporation with its principal place of business at 500 Dallas Street, Houston, Texas 77002, doing business in the Commonwealth of Massachusetts. Shell Trading (US) Company may be served with process through its registered agent, Corporation Service Company, 84 State Street, Boston, Massachusetts 02109.

50.        **Sunoco, Inc., individually and formerly known as Sun Oil Company, and formerly known as Sun Company, Inc., and as successor-in-interest to Coastal Eagle Point Oil Company,** is a Pennsylvania corporation with its principal place of business at 1801 Market Street, 27th Floor, Philadelphia, Pennsylvania 19103, doing business in the Commonwealth of Massachusetts. Sunoco, Inc. may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

51.      **Sunoco, Inc. (R&M), individually and formerly known as Sun Refining and Marketing Company and formerly known as Sun Company Inc. (R&M),** is a Pennsylvania corporation with its principal place of business at 1801 Market Street, 27th Floor, Philadelphia, Pennsylvania 19103, doing business in the Commonwealth of Massachusetts. Sunoco, Inc. (R&M) may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

52.      **Texaco, Inc.,** is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583, doing business in the Commonwealth of Massachusetts. Texaco, Inc. may be served with process through its registered agent, Prentice-Hall Corporation System, Inc., 84 State Street, Boston, Massachusetts 02109.

53.      **Texaco Refining & Marketing (East), Inc.,** is a Delaware corporation with its principal place of business at 1111 Bagby Street, Houston, Texas 77002, doing business in the Commonwealth of Massachusetts. Texaco Refining & Marketing (East), Inc. may be served with process through its registered agent, Prentice-Hall Corporation System, Inc., 84 State Street, Boston, Massachusetts 02109.

54.      **TMR Company (f/k/a Texaco Refining and Marketing, Inc., individually and as successor-by-merger to TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.)),** doing business in the Commonwealth of Massachusetts, may be served with process via its registered agent, The Prentice-Hall Corporation System, 84 State St., Boston, MA 02109.

55.      **Tosco Corporation, individually and as predecessor-in-interest to**

**ConocoPhillips Company, also known as Tosco Refining Company, and also known as Tosco Marketing Company,** a subsidiary of ConocoPhillips Company, is a Nevada corporation with its principal place of business at 1500 North Priest Drive, Tempe, Arizona 85281, doing business in the Commonwealth of Massachusetts. Tosco Corporation may be served with process through its registered agent, Corporation Service Company, Attention: Marva Williams, 84 State Street, Boston, Massachusetts 02109.

56.     **TPI Petroleum, Inc.** doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of Massachusetts, One Ashburton Place, 17th Floor, Boston, MA 02108. at its principal of business at One Valero Place, San Antonio, TX 78212.

57.     **Union Oil Company of California d/b/a UNOCAL,** doing business in the Commonwealth of Massachusetts, may be served with process via its registered agent, CT Corporation System, 101 Federal St., Boston. MA 02110.

58.     **Unocal Corporation, individually and formerly known as Union Oil Company of California,** is a Delaware corporation with its principal place of business at 2141 Rosecrans Avenue, Suite 4000, El Segundo, California 90245, doing business in the Commonwealth of Massachusetts. Unocal Corporation may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, MA 02110.

59.     **Valero Energy Corporation.** the parent company of Valero Refining and Marketing Company, is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the Commonwealth of Massachusetts.    Valero Energy Corporation may be served with process through the

Secretary of State, Commonwealth of Massachusetts, Corporations Division, One Ashburton Place, 17th Floor, Boston, Massachusetts 02108, and through its principal place of business at One Valero Place, San Antonio, Texas 78212.

60. **Valero Marketing and Supply Company**, a subsidiary of Valero Refining and Marketing Company, is a Delaware corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the Commonwealth of Massachusetts. Valero Marketing and Supply Company may be served with process through its registered agent, CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

61. **Valero Refining Company**, doing business in the Commonwealth of Massachusetts, may be served with process via the Secretary of State, Commonwealth of Massachusetts, State House, Room 337, Boston, MA 02133, at its principal of business at One Valero Place, San Antonio, TX 78212.

62. **Valero Refining and Marketing Company** is a Texas corporation with its principal place of business at One Valero Place, San Antonio, Texas 78212, doing business in the Commonwealth of Massachusetts. Valero Refining and Marketing Company may be served with process through the Secretary of State, Commonwealth of Massachusetts, Corporations Division, One Ashburton Place, 17th Floor, Boston, Massachusetts 02108, and through its principal place of business at One Valero Place, San Antonio, Texas 78212.

## JURISDICTION AND VENUE

63. This Court has jurisdiction over Defendants because they are either Massachusetts corporations authorized to do business in Massachusetts, are registered with the

Massachusetts Secretary of State, do sufficient business with sufficient minimum contacts in Massachusetts, or otherwise intentionally avail themselves of the Massachusetts market through the sale, manufacturing, distribution and/or processing of petroleum-related products in Massachusetts to render the exercise of jurisdiction over Defendants by the Massachusetts courts consistent with traditional notions of fair play and substantial justice There is no diversity of citizenship in this action.

64.  Venue is proper in this Court because at least one of the transactions giving rise to these causes of action – the actual or threatened contamination of Plaintiff's property by MTBE took place in Boston, Massachusetts and/or one or more Defendants has its usual place of business in Chelsea, Massachusetts

## MTBE Facts

65.  MTBE is a member of a class of chemical compounds called aliphatic ethers, one of whose properties is that they are "hydrophilic," or water-seeking, *i.e.*, they have enhanced solubility in water and chemical attraction to water molecules.

66.  MTBE does not occur naturally

67.  MTBE is produced from methanol and isobutylene, a by-product of the gasoline-refining process. MTBE is not found in gasoline unless someone adds it.

68.  Defendants used and continue to use MTBE as a gasoline additive.

## Why Defendants Add MTBE to Gasoline: Profit

69.  Sometime after 1979, Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2 to 4% in order to boost the octane level in higher grades of gasoline.

70.  MTBE was not the only viable option to achieve higher octane in gasoline. Rather, its use reflected a choice and preference of Defendants, to make money off gasoline refining

waste byproducts.

71    Since the early 1990's, Defendants have chosen to add MTBE to gasoline in much greater

concentrations, typically 11-15%, in all grades of gasoline. Defendants claim that MTBE,

an oxygenate, helps fuel burn more efficiently to reduce air pollution. Defendants'

motivation for including MTBE in gasoline, however, was to boost octane cheaply and

increase their own profits, and their use of MTBE as a gasoline additive predated the

environmental concerns they invoke to justify their use of MTBE. The Clean Air Act of

1990 required oxygenates but Defendants chose MTBE from a list of possibilities as a cheap

method to comply.

72    Ironically, it is now apparent that MTBE does not even deliver Defendants' promise of

cleaner air. Contrary to industry assurances, MTBE does little or nothing to reduce such air-

polluting car emissions as carbon monoxide or smog precursors. A detailed 1998 report

commissioned by the State of California concluded that "there is no significant air quality

benefit to the use of oxygenates such as MTBE in reformulated gasoline" when compared

to alternative non-oxygenated formulations.[1]

73.    In May 1999, The National Research Council of the National Academy of Sciences ("NAS")

issued a report concluding that MTBE does little to reduce ozone air pollution and smog.[2]

74    NAS previously had concluded that reductions of carbon monoxide concentrations in the

nation's air actually took place before MTBE was added to gasoline as a purported "clean

air" oxygenate.[3]

---

[1]    Health and Environmental Assessment of MTBE. Report to the Governor and Legislature of
the State of California as sponsored by SB 521 (Nov. 12 1998)

[2]    The Ozone-Forming Potential of Reformulated Gasoline. Nat'l Research Council. Nat'l
Academy of Sciences (May 11. 1999)

[3]    "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels". Nat'l Research

75. In fact, combustion of gasoline containing MTBE in car engines actually increases exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals including MTBE itself.

**Gasoline containing MTBE has widely contaminated and
continues to pose a threat to water**

76 MTBE is more than an order of magnitude more soluble in water than other gasoline constituents and therefore has a stronger affinity for and dissolves more easily in any available water. In technical terms, MTBE has a low octanol water partition coefficient and high solubility in water, particularly as compared to other common gasoline components – benzene, toluene, ethylbenzene and xylene (collectively "BTEX compounds").

77 Whenever gasoline with MTBE leaks, spills, or is otherwise released into the environment, the MTBE races through water reservoirs, spreading faster and farther than other chemical components contained in gasoline.

78. In addition to traveling faster and further, MTBE resists physical, chemical and microbial degradation. As a result, MTBE is slow to break down after it is released into the environment. Plumes of MTBE can persist for many decades, far longer than other components of gasoline. Once an MTBE plume reaches a water source, it continues to contaminate the water drawn from that source.

79 Even in very small quantities, MTBE gives water a foul taste and odor that renders the water unusable and unfit for human consumption MTBE's taste and odor alone are enough to render previously potable water unfit for consumption.

80. Research has shown that some people can detect the distressing turpentine-like taste or odor at concentrations as low as one part per billion ("ppb") or lower.

81.    MTBE is also a known animal carcinogen that is linked to many potential human

health problems  The U.S. Environmental Protection Agency ("EPA") considers

MTBE to be a possible human carcinogen.

**The longstanding prevalence of unintended gasoline discharges ensures that
gasoline with MTBE will contaminate water.**

82.    Prior to the introduction by Defendants of MTBE as a gasoline additive, leaking

underground storage tanks ("UST") and other gasoline discharges were a known threat

to Massachusetts' water. The introduction of gasoline containing MTBE in steadily

increasing quantities and concentrations exponentially exacerbated the threat to water

caused by leaking USTs.  Because of MTBE's unique properties, the addition of

MTBE to gasoline created an entirely new threat from even very small leaks and spills

of gasoline

83.    Given the properties of MTBE and the long history of gasoline spills, leaks and other

losses during distribution, sale and use, widespread MTBE contamination of water was

and is both inevitable and foreseeable by Defendants.

**Defendants have known all along that adding MTBE to gasoline would
result in massive groundwater contamination.**

84.    At all times relevant to this litigation, Defendants were aware that there is a national

crisis involving gasoline leaking from multiple sources, such as USTs  Substantial

industry reports, Congressional testimony, and concerns expressed by the EPA show

Defendants' knowledge that the systems used for shipping, storing, pumping, and using

gasoline involve leaks and spillages at all links in the gasoline distribution chain.

85.    At all times relevant to this litigation, Defendants were aware that thousands of gallons

of gasoline enter the soil annually from gasoline-dispensing stations due to consumer

and jobber overfills and from leaks, as described above.

86.  At all times relevant to this litigation, Defendants were or should have been aware of the potential for additional mishandling events involving gasoline used and/or stored by nearly every American adult.

87.  At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reach the soil and water through vaporization from USTs, and that such vaporization and other small releases occur even when a tank is considered to have tested tight.

**Defendants' knowledge of the threat to water as a result of unintended discharges of gasoline blended with MTBE.**

I.    **Defendants' constructive knowledge of MTBE's threat to water.**

88.  At all times relevant to this litigation, Defendants were or should have been aware that MTBE contamination of water was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale and use

89.  For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry including Defendants in a broad range of topics, formed a Toxicology Committee in or around 1980.  The Toxicology Committee included Exxon, Mobil, Shell, Arco, Tosco and Chevron, among others.

90.  API's Toxicology Committee had a specific program to study MTBE  Meeting minutes make plain that committee members shared information and repeatedly discussed MTBE's propensity to contaminate water.  The Committee specifically acknowledged the need for certain toxicological information due to MTBE's

propensity to contaminate water and thus the likelihood of extensive ingestion of MTBE through drinking water.

91. Despite early knowledge and a shared recognition of the need to do low level, long term ingestion studies on the effects of MTBE, none was ever undertaken or completed by Defendants.

92. Defendants possess and have always had knowledge, resources, experience and other advantages which are vastly superior to those of Plaintiff concerning the manufacture, distribution, nature and properties of gasoline in general and MTBE in particular. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, Defendants have at all times relevant to this litigation been in a position to know the threat which MTBE poses to water.

93. In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

**II.    Defendants' early knowledge of specific instances of MTBE contamination of water.**

94. Defendants knew at least as early as 1980 of the impact of MTBE and its contamination of water.

95. In or around October 1980, Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies serving thousands of water consumers.

Approximately 4,000 residents of Rockaway tasted MTBE or DIPE (another ether) in water supplied from a municipal well, leading oil industry insiders to further investigate the groundwater threat posed by MTBE.

96.     In April 1983, a serious MTBE incident in Jacksonville, Maryland, in Baltimore County came to public attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one owned by ExxonMobil, the other owned by Chevron, created a large underground reservoir of MTBE that fouled the domestic wells of local residents and stalled a planned housing project.

97.     Defendants were also aware of two MTBE groundwater contamination events in Liberty, N.Y., and East Patchogue, N.Y., both of which preceded by several years the introduction of gasoline with higher concentrations of MTBE and presaged the now widespread calamity.

98.     At the East Patchogue site, spilled gasoline left over from the operation of a filling station whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE into Long Island's sole source aquifer.  The MTBE plume was detected when the water from a private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of MTBE.  Although trace levels of BTEX were eventually found in wells, that did not happen until the MTBE levels had reached the astounding level of 7,600 ppb.

99      A decade after the spill in East Patchogue, government officials were still tracking the MTBE plume through the aquifer thousands of feet from the site.  In contrast, BTEX compounds were found concentrated in the soils and water much closer to the spill site,

and the mass of these compounds was observed to be steadily decreasing through biodegradation.

100.    The Liberty incident started sometime before August 1990, when state health officials learned that a sample of the Village of Liberty's public water supply, drawn from local groundwater, tested positive for MTBE.

101.    In December 1992, MTBE was again found in Liberty's water at concentrations approximately three times higher than the New York State Department of Health drinking water standard of 50 ppb.

### III. Defendants' awareness of the 1986 Garrett Report specifically warning of inevitable MTBE contamination of groundwater.

102.    In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" ("the Garrett Report").[4]  The paper described approximately 30 Maine wells contaminated with MTBE.  The authors explained that as a result of their experience dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is difficult to remediate, (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components, and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

---

[4]    Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water Contaminate " in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water — Prevention Detection, and Restoration  Houston, TX, November 12–14, 1986 [Proceedings]; Dublin  OH, National Water Well Ass'n. pp  227  248

103.    As a result of MTBE's characteristics, the Garrett Report's authors recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. The paper was to be presented at and published in the proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National Well Water Association and the API in November of 1986

104.    As soon as the existence of the Garrett Report was known, even before it was published, the draft was widely circulated throughout the oil industry  Oil industry representatives, including many of the Defendants, joined forces and acted to pressure the authors to radically revise their negative conclusions and recommendations about MTBE. Even after succeeding in having the report's language softened. Defendants continued to discredit the report

105.    Arco Chemical, which was then a part of Arco, initially became involved in October of 1986, prior to the presentation of the first version of the paper.  Arco Chemical provided "data that indicated that many of their theories were incorrect" to the authors of the paper in an attempt to change their opinions. However, despite Arco Chemical's efforts, the authors concluded that "MTBE presented an environmental hazard different to other gasoline components" and went ahead with their presentation of the paper to the National Well Water Association in November of 1986

106.    On December 23, 1986. a staff person to the Groundwater Technical Task Force ("GTTF") of API forwarded the Garrett Report to members of the GTTF. including representatives of Shell and Exxon. These individuals were asked to review the

- 27 -

Garrett Report and provide comments/critiques. The stated reason was that the article was "of possible grave concern to the oxygenate producers."

107.    The comments from the GTTF members culminated in a letter from API to the National Well Water Association, which was to present the paper. The letter states in part:

> The authors' "recommendations" that MTBE be either banned as gasoline additives or require double-lined storage is clearly a policy statement and not an objective credible scientific conclusion. Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted and counter-productive.

108.    However, the API letter to the National Well Water Association in no way refuted the Garrett Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the conclusion that MTBE was difficult to remediate. These issues were not even addressed.

109.    BP Corporation (then known as "Amoco") publicly denounced the Garrett Report, stating flatly that the report "isn't true."

## IV. Defendants' internal documents demonstrating their awareness of MTBE Contamination of water.

110.    Privately, however, Defendants were forced to acknowledge that the major findings of the Garrett Report were correct. For instance, while the oil companies, via the GTTF, attacked the authors of the Garrett Report, saying the paper had a "general lack of technical data to support the rather strong policy statements," behind closed doors, Defendants were admitting that the authors might in fact be correct. Arco Chemical, in communications to others within the oil industry, admitted that they had no data to

refute the Garrett Report's conclusions. For example, a letter dated February 4, 1987, states "we don't have any data to refute the comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

111. On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based upon a compilation of data on MTBE contamination of groundwater in New York State and elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water samples from three wells in Harrison, New York, and four wells in Port Jefferson, New York. In its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene." The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE. From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

112. Communications among officials at ChevronTexaco (Chevron) were similar. A 1987 memo, widely circulated within the company, states:

Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).

MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.

Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon

adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

113.    In 1992, Shell employees C.C. Stanley, W.G. Rixey, and C.Y. Chiang created a

document entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater."

The purpose of the document was to put together what was known about the

movement of MTBE in groundwater and the document was to be circulated internally

among the employees of the various Shell companies.

114.    According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than

benzene and therefore, MTBE's plumes are expected to move faster and farther than

benzene plumes emanating from a gasoline spill. Further, Shell's MTBE White Paper

indicates that MTBE does not biodegrade in the subsurface environment. Finally,

Shell's MTBE White Paper indicates that MTBE has a low odor and taste threshold

and that "at many locations odor and taste criteria may determine clean-up levels."

115.    Shell's MTBE White Paper further states:

MTBE has had an impact on groundwater management at only a few Shell marketing terminals and service stations to date. However, as the usage of this oxygenate begins to increase, a stringent clean-up criteria for MTBE will become adopted in more states, we should anticipate increased concerns over how its release to groundwater is managed.

Not surprisingly, this paper was never published outside of Shell.

MTBE is relatively quite soluble in water (compared to other components in gasoline, like BTEX), and it moves essentially with the ground water, thus MTBE tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a very low biodegradation potential, which makes it more difficult to remove from ground water than other gasoline components such as BTEX.

116.    The threat MTBE poses to groundwater was also discussed in a May 1999 paper by

employees of Chevron entitled "Solving Problems From MTBE Contamination – It's

Not Just Regulating Underground Tanks." The document reads:

> [C]oncerns on the mobility and persistence of MTBE in the environment are reinforced by a recent study and anecdotal information discussed at an EPA Blue Ribbon Panel on MTBE in January 1999. This information indicates there is MTBE ground water contamination from small spills of gasoline (e g , a spill in parking lot, a car accident) – incidences that stand in contrast to known historical causes of MTBE contamination (e g , point source discharges from leaking underground storage tanks )

> The physical and chemical properties of MTBE (and thus its mobility and persistence in the environment) differ markedly from other components of gasoline.  These differences make MTBE (and other ethers and heavy alcohols) more likely to get into ground water and problematic to contain and clean up when releases occur . . .

> Short of eliminating car accidents, stopping customer overfilling, or other impractical approaches, changes in law or regulation can't fully eliminate releases, nor change the physical and chemical properties of MTBE and other oxygenates when they do get in the environment

### V.  Defendants' knowledge that no adequate toxicity studies had been done prior to Defendants' decision to add MTBE to gasoline

117.    Defendants added MTBE to gasoline even though no long-term cancer studies had

been undertaken.  Studies showed MTBE caused cancer in animals.  It is common

knowledge within the scientific community, and Defendants knew, that prior to the

introduction of a widely used chemical like MTBE, toxicological tests must first be

performed.    However, Defendants did not perform the standard toxicological

procedures to test the effects of MTBE prior to placing it into the stream of commerce.

Instead, Defendants attempted to convince the EPA that health testing of MTBE was

not needed.  Thus, Defendants exposed millions of Americans to potential harm

without warning of the potential health risks associated with MTBE

**VI. Despite knowing that adding MTBE to gasoline inevitably results in widespread MTBE water contamination, Defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline.**

118.    Despite their superior knowledge of the water threat posed by MTBE, Defendants, beginning in the early 1980's, formed various formal and informal task-forces and committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants' use of MTBE without regard to its impact on Plaintiff and convincing the public and regulators that increasing concentrations of MTBE in gasoline was desirable. Defendants formed these joint task-forces and committees under the auspices of trade organizations such as the API and the Oxygenated Fuels Association ("OFA"). Defendants, as members of these joint task forces and committees, conspired to conceal the risk of MTBE contamination of water and agreed to use MTBE, thereby placing corporate profits above known-but-concealed harm to the environment and Plaintiff. Defendants manufactured and distributed MTBE with actual knowledge of MTBE's defects and with actual knowledge that MTBE would cause harm in water and took affirmative steps to conceal those effects.

**A.    Defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act (TSCA) in the late 1980's.**

119.    In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks[5] The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not to be readily biodegradable. The ITC

---

[5]    Nineteenth Report of the ITC to the Administrator. Receipt and Request for Comments Regarding Priority List of Chemicals. 51 Fed. Reg. 220 (1986) (the "1986 Notice").

recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also recommended additional medical testing of MTBE and invited written comments. The 1986 Notice credited the Dynamac Corporation for supplying the government with MTBE information.

120.    The oil industry, including Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

121.    On or about December 12, 1986, ARCO, speaking on behalf of and/or with the approval of the Defendants, responded to the 1986 Notice in an effort to derail further testing of MTBE.    ARCO's comments included a critique of the Dynamac Corporation's information review of MTBE. on which the ITC had relied. ARCO stated that its "critique of the CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated." In further comments to the EPA, ARCO stated the following:

Characteristics – Moderate water solubility is reported. However, an ARCO Technical Bulletin states that 'MTBE is only slightly soluble in water...'

\*\*\*

The CRSC/Dynamac report states that potential environmental exposure is 'high' This conclusion is not supported by the available information.

\*\*\*

Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility. The closed nature of the manufacturing and transportation process reduces worker exposure and product loss. Training and safety programs also lower the possibility of accidental spills. Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking underground storage tanks... MTBE losses would be extremely small from this source.

\*\*\*

VI.  Environmental Information

As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain.... Environmental entry of MTBE from this source would be considerably less than the report indicates

MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

ARCO's comments, made with other Defendants' explicit or implicit approval, were

misleading when made, improperly downplaying the risks of MTBE contamination of

water and omitting material facts known to Defendants at the time.

122.    On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments

on the need for additional testing of MTBE. The Minutes of the meeting show that

government officials expressed concern over the need to assess the potential for

groundwater contamination. The Minutes show that Arco and Exxon made a

presentation to support the industry position that additional medical testing of MTBE

was unnecessary. Other Defendants assented to these representations either explicitly

or by their silence.

123.    In or around early 1987, Defendants formed the "MTBE Committee," with the express

and stated purpose, as set forth in a written agreement, of "addressing the

environmental, health, safety, legislative and regulatory issues concerning MTBE of

importance to the public and the producers and users of MTBE." The MTBE

Committee included BP Corporation (Amoco), Arco, Chevron, Citgo, ExxonMobil

(Exxon), Shell, and Sunoco, among others.

124.    The MTBE Committee lauded itself as "being a source of information to MTBE

producers, users, the government and the public" and stated that its goal was to

"address environmental health and safety issues relating to MTBE ..., provide technical

data to appropriate regulatory agencies and legislative bodies..., conduct[] and fund[] testing of MTBE required under a Toxic Substances Control Act Section 4 Consent Order or Test Rule..., [and] make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuels."

125. On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE Committee, had its first meeting. The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC report is as follows: Since each producer must respond to the EPA before February 12 on the 8A and 8D [sic] questions and many will respond individually to production and economic questions which were also sought by EPA, a letter will be sent by George Dominguez requesting that information requested by the EPA be sent to the MTBE Committee before February 9. A form will be included in George's letter. The Technical Committee will then meet on February 19 to combine the three reports from the working groups and draft a response to the EPA which will then be passed on to the Steering Committee for their approval on February 20... The combined response to the EPA will be submitted by February 27, to be followed shortly thereafter by a formal visit to EPA. Dominguez will meet with EPA and notify them that the MTBE Committee has been formed and will be submitting its overview.

126. Although Defendants were keenly aware that the EPA was interested in obtaining more information about MTBE in groundwater, Defendants were not forthcoming in their responses to the EPA. On February 12, 1987, Arco Chemical responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects in a letter stating:

> Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

127.    At the same time that Arco Chemical was telling the EPA that MTBE posed no

significant environmental or health problems, Arco Chemical admitted to some of the

other Defendants that it "had no data to refute the claims made in the Garrett Report

that MTBE posed a significant threat of groundwater contamination."

128.    On or around February 27, 1987, the MTBE Committee submitted written comments

drafted to convince the EPA not to require additional health and environmental testing

of MTBE. The information provided by Defendants was misleading and false  For

example, the Defendants provided information to the EPA representing that MTBE is

only slightly soluble in water, that potential environmental exposure is not high, and

that MTBE has excellent biodegradation characteristics.   The MTBE Committee's

Statement added:

> there is no evidence that MTBE poses any significant risk of harm to health or the
> environment, that human exposure to MTBE and release of MTBE to the environment
> is negligible, that sufficient data exists to reasonably determine or predict that
> manufacture, processing, distribution, use and disposal of MTBE will not have an
> adverse effect on health or the environment, and that testing is therefore not needed to
> develop such data.  Furthermore, issuance of a test rule requiring long term chronic
> testing will have a significant adverse environmental impact.

129.    The agenda of the MTBE Committee is reflected in the following excerpt from those

comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years to complete,
> great uncertainty will be created as to whether MTBE is a safe fuel additive  As a
> result, demand for MTBE and expansion of productive capacity is not likely to grow
> significantly. Refiners will be likely to commit capital to more costly alternative
> methods of octane enhancement such as isomerization and reformate plants that do not
> have the environmental benefits of MTBE. Thus, requiring long term testing of MTBE
> will have a significant adverse environmental and economic impact

130.    The MTBE Committee acknowledged in its February 27, 1987 comments that MTBE had not been the subject of long-term chronic health testing but claimed that such testing was unnecessary Under the heading "MTBE in Groundwater," it stated that:

> [t]he results of a number of acute and sub-chronic health effect studies are presented in the Health Effects Summary of this report. These data suggest that the odor detection level of 700 ppb (approximately 0.7 mg/l) is such that the organoleptic properties of MTBE are sufficient to protect against human ingestion of toxic quantities of MTBE

Defendants sought to be free to represent that MTBE has been shown not to be a health risk without conducting the research needed to reach such a conclusion.

131.    On the issue of the persistence of MTBE, the MTBE Committee stated that "a Japanese study... reports that MTBE in the presence of gasoline has excellent biodegradation characteristics" This misrepresentation concerning the biodegradability of MTBE. which omitted the contrary and more accurate information that MTBE was already known to be recalcitrant to biodegradation, is further evidence of Defendants' practice of concealing from government regulators and the public the actual risk that MTBE poses to water

132.    On or around January 21, 1988. MTBE and/or gasoline manufacturers and distributors. including BP Corporation (Amoco). ExxonMobil (Exxon), Sunoco and Chevron signed a Testing Consent Order with EPA  However, a subsequent notice shows that after extensive negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate testing was not necessary to determine the environmental risk posed by MTBE.[6]  The oil industry. including Defendants, thus succeeded in

---

[6]    Testing Consent Order on Methyl Tert Butyl Ether and Response to the Interagency Testing Committee. 53 Fed Reg 62 (1988)

misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary. Defendants knew or should have known at the time that this representation was false and misleading

133    The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time. The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's disastrous effect upon water. In making and supporting such representations. the Defendants demonstrated their willingness to use any means to place their economic interest above the health, property and well-being of Plaintiff particularly and the America public generally, and clearly intended to (a) continue to use MTBE without regard to its impact on Plaintiff and the environment, and (b) prevent Plaintiff from becoming aware of the contamination and/or impact of contamination from MTBE.

134.    Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing.    The MTBE Committee's Charter statement was intended to mislead the government and the

public, including Plaintiff. The MTBE Committee disbanded approximately one year after achieving its goal of avoiding testing.

**B.    Defendants misled Congress into effectively broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act.**

135.    Prior to 1990, Congress was preparing to take action to address the Nation's smog problem

136.    During this time frame, the oil industry, including Defendants, became concerned that Congress might consider requiring alternative non-petroleum based fuels.

137.    As a result of tremendous lobbying efforts by the industry, including Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990 Amendments to the Clean Air Act.  According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency (EPA) or other parts of the federal government."

138.    In the 1990 Amendments to the Clean Air Act, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems.  The 1990 Amendments authorized the EPA to mandate that certain areas of the country designated as non-attainment for carbon monoxide (CO) participate in RFG programs.[7]  Massachusetts opted in as a participant in the oxygenated fuel program.

139.    In 1992, in conjunction with the Clean Air Act, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in

---

[7]    Oxygenated fuel is very similar to normal gasoline except that it contains an extra additive, termed an oxygenate that purports to reduce tailpipe emissions of carbon monoxide by twenty-five (25%) percent.

gasoline in certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter months.

140.     The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE. MTBE became Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered Defendants the highest profit margin of all the oxygenates available. Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different oxygenate, such as ethanol, from a third-party.

141.     Safer, more environmentally sound alternatives were available.

   C.   Defendants misled Plaintiff and the public, including all downstream gasoline handlers, about the hazards of gasoline with MTBE.

142.     Defendants misrepresented the properties of MTBE and withheld information even as they were insisting that no such information existed. Only more recently, through the escalating and tragic contamination of water resources, has the public started to become aware of the dangers of MTBE.

143.     On April 1 and 2, 1987, George Dominguez of the MTBE Committee gave an oral presentation at a Conference on Alcohols and Octane. Mr. Dominguez represented that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." Although the MTBE Committee was represented to have been formed to address environmental issues and to make available to the general public information regarding MTBE use in fuels, nowhere in the presentation did Mr. Dominguez inform the audience that MTBE is

different from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate and that it causes a greater risk of water contamination.

144.    In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions." The letter unambiguously represented to Plaintiffs that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

145.    As the reality of widespread MTBE water contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the Oxygenated Fuels Association ("OFA"), an agent of Defendants, published and distributed a pamphlet fashioned "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of misleading communication utterly failed to alert public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (hereinafter referred to as Downstream Handlers) or the general public to the dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

146.    In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning,

when MTBE pollutes water, it "can serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline."

147    This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the fact that MTBE is usually not merely the first, but also the worst or sometimes the only, contaminant imported to groundwater by gasoline    Moreover, MTBE contamination is most often judged to be too costly to clean up.

148.    Had Defendants warned Downstream Handlers and the general public of the known hazards MTBE presented to drinking water supplies, they would have sought alternatives and demanded that Defendants provide environmentally-responsible gasoline free of MTBE.

149    As a result of Defendants' failure to warn of the hazards posed by MTBE contamination of water, Plaintiff was deprived of facts from which its injury from MTBE contamination could reasonably have been inferred.

**VII. Defendants dramatically increased their use of MTBE in gasoline after the creation of the RFG program.**

150    National annual production figures for MTBE reflect the oil industry's decision to make MTBE its oxygenate of choice: MTBE production increased from 1.5 million barrels in 1980 to 75 million barrels in 1998

151.    Much of the gasoline sold in non-attainment areas under the RFG Program exceeds that Program's minimum 2% or 2.7% oxygenate requirements, and MTBE comprises up to 15% of every gallon of gasoline used in those areas.

152.    Defendants started shipping high MTBE-content gasoline for sale in certain metropolitan areas in 1992 as part of the Oxyfuel Program.

153. Defendants then made MTBE the additive of choice throughout Massachusetts when the public and government agencies sought year-round reductions in air pollution caused by cars.

154 In or around January 1995, Defendants started putting gasoline containing higher levels of MTBE into the stream of commerce throughout Massachusetts when moved by market factors and financial considerations to do so. Gas stations owners and pump operators, whom Defendants never warned about the properties of MTBE or gasoline containing MTBE, started selling Defendants' gasoline with greatly elevated concentrations of MTBE.

155. Today most if not all gasoline pumped in the RFG areas of Massachusetts is laced with high concentrations (11 to 15 percent) of MTBE. In addition, gasoline containing elevated concentrations of MTBE is often sold at other locations at the discretion of the oil industry, including Defendants.

156 In making MTBE their oxygenate of choice, Defendants decided to forego safer oxygenates, such as ethanol. In fact, belatedly, some gasoline sellers have publicly acknowledged that MTBE is neither environmentally safe nor necessary. Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways. That's what we're doing at Getty. We have replaced MTBE with **ethanol** in our gasoline because it helps clean the air without harming our drinking water.

### VIII. MTBE'S degradation product: TBA

157. TBA is used as a raw material in the production of isobutylene, which is then used to produce MTBE, it is an intermediate product of MTBE biodegradation, and it is also

sometimes added to gasoline as an oxygenate. Therefore, TBA often appears where there is MTBE contamination.

158. TBA has the same characteristics as MTBE that make it a persistent and pernicious water contaminant: high solubility (even more so than MTBE); resistance to biodegradation, etc.

159. TBA is even more expensive to clean up than MTBE. In fact, the presence of TBA in water being treated for MTBE may generate compounds potentially of health and environmental concern, limiting the usefulness of these technologies and further increasing costs.

160. In addition, TBA is highly toxic when inhaled and is irritating to the skin, eyes, and mucous membranes. There is also some evidence that TBA causes cancer and kidney and thyroid tumors in rats and mice exposed to it.

161. Defendants failed to warn Plaintiff, regulators, and the general public that they often add TBA to their gasoline and that MTBE breaks down into TBA. Further, Defendants failed to warn Plaintiff of the need to test their water supply for contamination by TBA.

162. As a result, TBA is appearing in water supplies all across the country, where MTBE contamination exists.

**IX. MTBE has had a predictably catastrophic effect upon water.**

163. One can reach and affect the largest number of Americans by adding something to their gasoline: everybody drives. Before the 1980's, production and sales totals for MTBE were negligible, but by 1996 MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

164.  Since gasoline containing MTBE at increased levels was introduced in the early 1990s, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. MTBE-contaminated water has been found from coast-to-coast with serious incidents in states from New Hampshire to California

165.  The Commonwealth of Massachusetts is particularly susceptible to MTBE contamination. Seven of the seventy sole source aquifers designated by the EPA are in Massachusetts. For example, the Cape Cod Aquifer was designated a Sole Source Aquifer by the United States Environmental Protection Agency in 1982 and is the sole source of potable water for over 225,000 year-round inhabitants.

166  In 1999, the Massachusetts Department of Environmental Protection issued emergency drinking water regulations to require testing of all public water supply wells for MTBE contamination. MTBE has been detected in the wells of over 200 public water providers throughout Massachusetts MTBE has been found in drinking water at levels ranging up to 240 ppb in communities all over the state.

167.  The U.S.G.S. annually tests the groundwater not near any known gasoline leaks or spills and now detects MTBE in over 20% of aquifers tested in places, like Massachusetts, where high MTBE-content gasoline is used.

168.  A September 15, 1999 report by a special EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources"; that MTBE "has caused widespread and serious contamination"; and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas. As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE

"indicates substantial evidence of a significant risk to the nation's drinking water supply."

169.   In its September 15, 1999, report, the special EPA Blue Ribbon Panel which reviewed the record of MTBE contamination of groundwater recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating, particularly in those areas where high MTBE-content gasoline is used, assessments of drinking water protection areas required under the Safe Drinking Water Act. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[8] No actual plans or source of funds for such testing exist in any state, including the Commonwealth of Massachusetts.

170.   Based upon the recommendations of the Blue Ribbon Panel, the EPA has recently initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the TSCA in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

X.   **In the event Defendants are unable to apportion liability Plaintiff asserts claims for alternative liability and enterprise liability.**

171.   Gasoline containing MTBE, once it has been released to the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured that particular batch.

---

[8]   "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in gasoline" (Sept. 15 1999)

172.   The process of manufacture and distribution of petroleum products, including gasoline containing MTBE, includes complex arrangements whereby the Defendants trade, barter or otherwise exchange product for delivery throughout Massachusetts.

173    Contamination, even if it comes from a single tank, pipeline or vessel, frequently originates from mixed batches of gasoline coming from different refiners   Gasoline containing MTBE from the various refiners is commingled during transmission by pipelines from refineries to distribution centers  The gasoline at any particular service station comes from many different refiners.

174    To the extent one or more Defendants contributed to Plaintiff's injuries, those Defendants are jointly and severally liable.

175    In the event that Defendants are unable to precisely identify the specific manufacturer of any given quantity of gasoline that was the source of MTBE found in Plaintiff's water or water source, and therefore apportion liability, Plaintiff asserts Defendants are, or may be, liable under theories of market share liability, concert of action, alternative liability and enterprise liability for those injuries which Defendants have collectively visited upon Plaintiff.

### FIRST CAUSE OF ACTION

#### Public Nuisance

176.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

177.   Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably

endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

178.    Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, knowingly unleashed massive, long-lasting and still spreading contamination of water, having concealed the threat from all, thereby causing MTBE contamination of water and contamination and threat of contamination of Plaintiff's water and water source.

179.    By their conduct, Defendants violated, continue to violate, and/or threaten to violate public rights to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted water.

180.    Actual and threatened gasoline and MTBE contamination caused by Defendants' conduct has caused and continues to cause injury to Plaintiff in the form of present testing costs and the potential for serious interference with the use, benefit and/or enjoyment of their property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.  MTBE presents a serious health hazard because it is a known animal carcinogen that the EPA considers to be a possible human carcinogen.

181.    Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a considerable number of persons.

182.    Gasoline and MTBE contamination, both real and immediate, constitutes a current existing as well as prospective public nuisance.

183.    Plaintiff, as a purveyor of drinking water, suffers injuries different in kind from the community at large precisely because it relies upon being able to produce water for its business.

184.    Plaintiff's special injuries therefore include: additional testing costs, loss of water production capacity and loss of consumer confidence arising out of the increasingly widespread public perception - based on actual fact - that the water has been rendered less certain, safe and reliable relative to other sources of water.

185.    Defendants knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital water resources relied upon by Plaintiff.

186.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff suffer injuries common to the public and additional special injuries from actual and/or threatened contamination of the Plaintiff's water and/or water source.

## SECOND CAUSE OF ACTION

### Breach of Warranty for Design Defect and/or Defective Product

187.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein

188.    Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of petroleum products, including gasoline containing MTBE.

189.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and

marketers of petroleum products, including gasoline containing MTBE, Defendants

owed a duty to all persons whom Defendants' petroleum products might foreseeably

harm, including Plaintiff, not to market any product which is unreasonably dangerous

for its intended and foreseeable uses.

190.    When Defendants placed gasoline containing MTBE into the stream of commerce, it

was defective, unreasonably dangerous, and not reasonably suited for its intended,

foreseeable and ordinary transportation, storage, handling, and uses for the following

reasons:

a.    unintended discharges of gasoline are commonplace throughout Massachusetts;

b.    when gasoline containing MTBE is released into the environment, MTBE has a
tendency to mix with water and migrate great distances;

c.    MTBE is highly soluble in water and many times more soluble in water than the
other organic (BTEX) components of gasoline;

d.    when gasoline containing MTBE is released into the environment, MTBE persists
much longer than the other organic (BTEX) components of gasoline, because
MTBE and TBA are recalcitrant to biodegradation and bioremediation;

e.    very low concentrations of MTBE will ruin the taste and smell of water; and

f.    MTBE is a known animal carcinogen and a possible human carcinogen and
otherwise unhealthy to ingest.

191.    Defendants with knowledge of the risks failed to use reasonable care in the design and

manufacturing of gasoline containing MTBE.

192.    Gasoline containing MTBE poses greater dangers to water than would be expected by

ordinary persons such as Plaintiff, Downstream Handlers and the general public

exercising reasonable care.

193    The risks which gasoline containing MTBE poses to water outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline.

194    Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

195.    The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by gasoline with MTBE.

196    Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

197.    Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

198.    As a direct and proximate result of the unreasonably dangerous and/or defective condition of gasoline containing MTBE and its introduction into the stream of commerce by Defendants, MTBE at all times relevant to this litigation has:

    a.    posed and continues to pose a threat to Plaintiff's water and/or water source;

    b.    required and/or will require additional testing and monitoring of Plaintiff's water and/or water source for MTBE contamination;

    c.    contaminated and/or will contaminate Plaintiff's water or water in the vicinity of Plaintiff's property;

d. raised the need to develop a comprehensive vulnerability study for Plaintiff's water source;

e. will require remediation of MTBE contamination or, where remediation is impracticable or insuffient, installation of a system to filter out MTBE or procurement of water from alternative sources; and

f. diminished consumer confidence in Plaintiff's water.

199. Defendants willfully and wantonly corrupted and polluted waters taken or held under G.L.C. 40 §§ 39(a)-(e), and injured other property owned, held or used by Plaintiff under the authority and for the purposes of G.L.C 40 §§ 39(a)-(e). Therefore, Plaintiff request an award of three times the amount of damages assessed, as provided by G.L.C. 40 §§ 39(g)

## THIRD CAUSE OF ACTION

### Breach of Warranty: Failure to Warn

200. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

201. As manufacturers, distributors, suppliers, sellers and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiff, the public, public officials and Downstream Handlers of the risk posed by MTBE.

202. Defendants knew that gasoline mixed with MTBE would be purchased transported, stored, handled, and used without inspection to identify the hazards which MTBE poses to water.

203. At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to water:

a. unintended discharges of gasoline are commonplace;

b.   when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with water and migrate great distances;

c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

d.   when gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.   at extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

f.   MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthful when ingested;

g.   MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid water contamination;

h.   MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.   MTBE creates the need to issue warnings to all water users in the area of any spill of gasoline containing MTBE;

j.   MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE; and

k.   the foregoing facts relating to the hazards which MTBE poses to water are not the sort of facts which Plaintiff, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

204.   Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Plaintiff, public officials, Downstream Handlers, and/or the general public.

205.   Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff. Plaintiff and others would have heeded legally

adequate warnings and MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE, and gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated water is gasoline, the absence of warnings was the proximate cause of all such contamination

206.    As a direct and proximate result of Defendants' above-described failure to give warnings, MTBE at all times relevant to this litigation have:

    a.    posed and continue to pose a threat to Plaintiff's water and/or water source;

    b.    required and/or will require additional testing and monitoring of the water and/or water source for MTBE contamination.

    c.    contaminated, continue to contaminate. and/or will contaminate Plaintiff's water and/or water in the vicinity of Plaintiff's water source;

    d.    raised the need to develop a comprehensive vulnerability study for Plaintiff's water source;

    e.    will require remediation of MTBE contaminated water or, where remediation is impracticable, installation of a system to filter out MTBE or procurement of water from alternative sources; and

    f.    diminished consumer confidence in Plaintiff's water.

207.    Defendants willfully and wantonly corrupted and polluted waters taken or held under G.L.C. 40 §§ 39(a)-(e), and injured other property owned, held or used by Plaintiff under the authority and for the purposes of G.L.C. 40 §§ 39(a)-(e). Therefore. Plaintiff requests an award of three times the amount of damages assessed, as provided by G.L.C. 40 §§ 39(g).

## FOURTH CAUSE OF ACTION

### Negligence

208. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

209. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' petroleum products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

210. Defendants had a duty and the financial and technical means to test MTBE and gasoline containing MTBE, and to warn public officials, Downstream Handlers and the general public of any hazardous characteristics of MTBE known to them, their agents and employees.

211. At all times relevant to this litigation, Defendants knew or should have known that:

   a.   unintended discharges of gasoline are commonplace;

   b.   when gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with water and migrate great distances;

   c.   MTBE is highly soluble in water;

   d.   when gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremediation;

   e.   very low concentrations of MTBE can ruin the taste and smell of water;

f.  MTBE is a known animal carcinogen and a possible human carcinogen and therefore exposes people to unknown health risks;

g.  MTBE greatly increases the importance of preventing leaks of gasoline;

h.  MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

i.  MTBE creates the need to issue warnings to all water users in the area of any spill of gasoline containing MTBE;

j.  MTBE creates a need for more regular testing and monitoring of water for early detection of MTBE; and

k.  the foregoing facts relating to the hazards which MTBE poses to water are not the sort of facts which Plaintiff, Downstream Handlers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

212.  Defendants have negligently breached their duties of due care to Plaintiff,

Downstream Handlers, and the general public by, among other things:

a.  failing to adequately test, identify and remediate water contaminated with MTBE;

b.  forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to water;

c.  voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

d.  marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

e.  failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

f.  failing to curtail or reduce MTBE's manufacture and distribution;

g.  failing to instruct Downstream Handlers and the general public about the safe handling and use of gasoline containing MTBE;

h.  failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

i.  negligently releasing MTBE into the environment;

j.  failing to warn and instruct Downstream Handlers and the general public about the risks to water posed by gasoline containing MTBE, about the necessary precautions and steps to prevent or minimize spills and leaks of gasoline in distribution, storage and use, and to about how remediate such spills and leaks promptly.

213.  As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, MTBE at all times relevant to this litigation has:

a.  posed and continues to pose a threat to Plaintiff's water and/or water source;

b.  required and/or will require additional testing and monitoring of Plaintiff's water and/or water source for MTBE contamination;

c.  contaminated the water system and zone of influence of the area that supplies Plaintiff's water source;

d.  raised the need to develop a comprehensive vulnerability study for Plaintiff's water source;

e.  required and will require remediation of gasoline and MTBE contaminated water or, when remediation is impracticable or insufficient, installation of a system to filter out MTBE or procurement of alternative water sources; and

f.  diminished consumer confidence in Plaintiff's water.

## FIFTH CAUSE OF ACTION

### Private Nuisance

214.  Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

215.  The water systems, including the zones of influence in the groundwater that supply Plaintiff's water, have been contaminated by MTBE and continue to be contaminated

by migration of MTBE, as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

216.    Gasoline and MTBE contamination caused by Defendants' conduct have damaged Plaintiff's property and business and unreasonably interfered with the use, benefit and enjoyment of Plaintiff's property.

217     As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff has suffered injuries from contamination of the water supplying Plaintiff.

## SIXTH CAUSE OF ACTION

### Trespass

218.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein

219     Plaintiff is the owner and/or actual possessor of property, easements, and the right to appropriate and use water, and water rights.  Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE is extremely hazardous to water and public water systems, including the property and other rights of Plaintiff.

220.    Defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE, and/or clean-up spills and leaks of MTBE, that they directly and proximately caused and continue to cause MTBE to contaminate Plaintiff's water systems and the zones of influence of the areas that supply Plaintiff's water.

221.   As a direct and proximate result of the trespass, Plaintiff has been damaged and are entitled to injunctive relief to abate the trespass and other damages alleged herein, including but not limited to, diminution in property value, loss of use and enjoyment, cost of bringing the property to its original condition, investigation, remediation, and treatment, and/or to such other appropriate relief Plaintiff may elect at trial.

222.   Defendants willfully and wantonly corrupted and polluted waters taken or held under G.L.C. 40 §§ 39(a)-(e), and injured other property owned, held or used by Plaintiff under the authority and for the purposes of G.L.C. 40 §§ 39(a)-(e). Therefore, Plaintiff requests an award of three times the amount of damages assessed, as provided by G.L.C. 40 §§ 39(g).

## SEVENTH CAUSE OF ACTION

### Civil Conspiracy

223.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

224.   At all times relevant to this lawsuit, Defendants actually knew of the hazards which MTBE posed to water throughout Massachusetts, including Plaintiff's water systems.

225.   Beginning in the early 1980s and continuing through the date of the filing of this Complaint, Defendants engaged in a common plan and concerted action to commit, assist and/or encourage a tortious act among Defendants.

226.   Specifically, Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

    a.   creating a market for MTBE with full knowledge of the hazards which MTBE poses to water throughout Massachusetts;

    b.   concealing the nature of MTBE and its impact on Plaintiff and the environment;

    c.   maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's water.

227.   Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

    a.   intentionally misrepresenting to the EPA and the public that MTBE was safe and did not pose a risk to water;

    b.   concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate water) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of MTBE be suppressed and not otherwise published by third parties and by downplaying any adverse findings related to MTBE;

    c.   concealing the dangers of MTBE from Downstream Handlers and consumers;

    d.   using their considerable resources to fight underground storage tank legislation; and

    e.   collectively deciding to use MTBE rather than other, safer oxygenates because MTBE was the most profitable oxygenate for Defendants to use

228.   As a direct and proximate result of Defendants' conspiracy, MTBE, at all times relevant to this litigation, has:

    a.   posed and continues to pose a threat to Plaintiff's water and/or water source;

    b.   contaminated and/or will contaminate Plaintiff's water or water in the vicinity of Plaintiff's property;

    c.   required and/or will require testing and monitoring of Plaintiff's water and/or water source for MTBE contamination;

    d.    requires or will require remediation of MTBE contaminated water or, where remediation is impracticable or insufficient for Plaintiff, installation of a system to filter out MTBE or procurement of water from alternative sources;

    e.    diminished and will continue to diminish Plaintiff's and consumers' confidence in, and the use and enjoyment of, Plaintiff's water and property;

    f.    diminished and will continue to diminish Plaintiff's property value due to actual, impending, or threatened contamination; and

    g.    caused and/or will cause Plaintiff to sustain substantially increased expenses, loss of the use of water and a threat to their appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court

229.    Defendants knew that it was substantially certain that their alleged acts and omissions described above would threaten public health and cause extensive contamination of public drinking water supplies and property damage.

230.    Defendants willfully and wantonly corrupted and polluted waters taken or held under G.L.C. 40 §§ 39(a)-(e), and injured other property owned, held or used by Plaintiff under the authority and for the purposes of G.L.C. 40 §§ 39(a)-(e). Therefore, Plaintiff requests an award of three times the amount of damages assessed, as provided by G.L.C. 40 §§ 39(g).

## EIGHTH CAUSE OF ACTION

### Violation of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act

231.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

232.    By committing the acts alleged in this complaint, each Defendant has acted in the capacity of a person who (a) by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage or treatment of hazardous

material to or in a site or vessel from or at which there is or has been a release or threat of release of hazardous material; (b) directly, or indirectly, transported any hazardous material to transport, disposal, storage or treatment vessels or sites from or at which there is or has been a release or threat of release of such material; and/or (c) otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, as defined by G.L.C. 21E § 5(a)(3)-(5).

233. As a direct and proximate result of Defendants' conduct, Defendants have caused and continue to cause significant damage to Plaintiff and Plaintiff's property, as alleged herein.

234. By committing the acts alleged in this complaint, Defendants are liable, jointly and severally, and without regard to fault, to Plaintiff for damage to Plaintiff's real and personal property incurred or suffered as a result of such release or threatened release of MTBE, pursuant to G.L.C. 21E § 5(a).

235. Defendants' violation of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act constitutes a violation of a statute the major purpose of which is to prevent or minimize damage to the environment. Therefore, G.L.A. § 7A. entitles Plaintiff to an injunction before the final determination of this action to restrain Defendants from causing further damage to the environment, to a speedy trial, and to costs, including reasonable expert fees, in the event of a finding in Plaintiff's favor

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment against these Defendants for:

1. Injunctive and equitable relief as the Court deems appropriate including:

   (i) investigation;

   (ii) testing and monitoring;

   (iii) alternative water;

   (iv) treatment of contaminated water;

   (v) water protection program;

   (vi) early warning system to detect MTBE before it reaches a water source;

   (vii) preventing Defendants from engaging in further releases of MTBE;

   (viii) compelling Defendants to abate the continuing nuisance by removing the contaminants from the soil and water; and

   (ix) all further measures necessary to remedy the MTBE contamination and to protect the water, public health and safety from further MTBE contamination.

2. Compensatory damages according to proof including, but not limited to, loss of consumer confidence and resulting business;

3. Three times the amount of actual damages, pursuant to G.L.C. 40 §§ 39(g);

4. Interest on the damages according to law;

5. Costs (including reasonable attorney and expert witness fees, pursuant to G.L.A. 21E § 15) and disbursements incurred in prosecuting this action; and

6. Any other and further relief as the Court deems just, proper and equitable.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: December __30__, 2004

_Richard Sandman_

Richard M. Sandman
RODMAN, RODMAN & SANDMAN, PC
BBO No. 440940
442 Main Street, Suite 300
Malden, MA 02148-5122
Telephone: (781) 322-3720
Fax: (781) 324-6906

Scott Summy, Texas Bar #19507500
Stephen Johnston, Texas Bar #00796839
(subject to Admission Pro Hac Vice)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181

Robert J. Gordon
(subject to Admission Pro Hac Vice)
WEITZ & LUXENBERG, P.C.
180 Maiden Lane, 17th Floor
New York, NY   10038-4925
Telephone: (212) 558-5500
Fax: (212) 558-5506

*Attorneys for Plaintiffs*



# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. CV 04-5654 E |
| vs. | ) |
| | ) |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant Amerada Hess Corporation, by and through its undersigned counsel, hereby

consents to the removal of this action by certain defendants, including ExxonMobil Corporation,

from the Superior Court Department, Suffolk County, Massachusetts to the District Court of the

United States for the district and division within which this action is pending.  While Amerada

Hess Corporation has not yet been served with the Complaint in the above-captioned matter,

Amerada Hess Corporation submits this Consent to Removal to indicate that it does consent to

removal in the event it may be served with the aforementioned Complaint. By so consenting,

Amerada Hess Corporation does not accept service or otherwise waive any applicable rights or

arguments, specifically including but not limited to personal jurisdiction arguments.

Dated:  January 24, 2005                By: _Tara Wilson_____
                                             Tara Wilson (MA Bar No. 655035)
                                             Mindy G. Davis
                                             Brent H. Allen
                                             Alan B. Sutton
                                             Jennifer R. Bagosy

HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
Tel: (202) 783-0800
Fax: (202) 383-6610

*Attorneys for Defendant Amerada Hess*
*Corporation*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## <u>CONSENT TO REMOVE</u>

Defendant American Refining Group, Inc. consents to the removal of this action from the

Superior Court Department Suffolk County, Massachusetts to the District Court of the United

States for the district and division within which this action is pending.

Respectfully submitted,

American Refining Group, Inc.
By its attorneys

Steven P. Wright BBO #648575
E-Mail: swright@kl.com
Kirkpatrick & Lockhart Nicholson Graham LLP
75 State Street
Boston, MA 02109
(617) 261-3100

Dated: January 20, 2005

BOS-719340 v1 0151310-0921

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

### CONSENT TO REMOVE

Defendants Chelsea Sandwich LLC, Cumberland Farms, Incorporated, Global

Companies, LLC, Global Montello Group, LLC, Global Petroleum Corporation, and Gulf Oil

Limited Partnership consent to the removal of this action from the Superior Court Department

Suffolk County, Massachusetts to the District Court of the United States for the district and

division within which this action is pending.

Respectfully submitted,

CHELSEA SANDWICH LLC,
CUMBERLAND FARMS, INCORPORATED,
GLOBAL COMPANIES, LLC, GLOBAL
MONTELLO GROUP, LLC, GLOBAL
PETROLEUM CORPORATION, AND GULF
OIL LIMITED PARTNERSHIP,

By their Attorneys,

Mark E. Tully (BBO #550403)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Dated: January 21, 2005

LIBA/1446996.1

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant CITGO Refining and Chemicals Company L.P. consents to the removal of this

action from the Superior Court Department Suffolk County, Massachusetts to the District Court

of the United States for the district and division within which this action is pending.

Date:   January **20**, 2005                Respectfully submitted,

CITGO Refining and Chemicals Company L.P.

J. Owen Todd
Lisa G. Arrowood
Kathleen Genova
Todd & Weld LLP
28 State Street
Boston, MA 02109
Phone:  (617) 720-2626
Fax:  (617) 227-5777
                                   -and-
Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
EIMER STAHL KLEVORN & SOLBERG LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Phone:  (312) 660-7600

Fax:  (312) 692-1718

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) | Removed from: Superior Court Department |
| | ) | Suffolk County, Massachusetts |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| vs. | ) | |
| | ) | Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## CONSENT TO REMOVE

Defendants Colorado Refining Company, TPI Petroleum, Inc., Valero Energy Corporation, Valero Marketing and Supply Company, and Valero Refining and Marketing Company[1] consent to the removal of this action from the Superior Court Department, Suffolk County, Massachusetts to the District Court of the United States for the district and division within which this action is pending.

Respectfully submitted,

Dated: January 21, 2005

BRACEWELL & PATTERSON, L.L.P.

By: _____

J. Clifford Gunter III
Tracie J. Renfroe
M. Coy Connelly

---

[1] Plaintiffs' Complaint also names Valero Refining Company, a non-existent entity.

Attorneys for Defendants
COLORADO REFINING COMPANY,
TPI PETROLEUM, INC., VALERO
ENERGY CORPORATION, VALERO
MARKETING AND SUPPLY
COMPANY, and VALERO REFINING
AND MARKETING COMPANY

J. Clifford Gunter III, Esq.
Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
BRACEWELL & PATTERSON, L.L.P.
711 Louisiana Street, Suite 2900
Houston, Texas 77002-2781
Telephone: (713) 221-1404
Facsimile: (713) 221-2123

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS ) | Removed from: Superior Court Department |
| ) | Suffolk County, Massachusetts |
| Plaintiff, ) | |
| ) | Case No. _____ |
| vs. ) | |
| ) | Honorable _____ |
| AMERADA HESS CORPORATION, et al. ) | |
| ) | |
| Defendants. ) | |

### CONSENT TO REMOVE

Defendant ConocoPhillips Company, f/k/a Phillips Petroleum Company, individually and as successor-in-interest to Tosco Corporation and d/b/a Phillips 66 Company consents to the removal of this action from the Superior Court Department Suffolk County, Massachusetts to the District Court of the United States for the district and division within which this action is pending.

Respectfully submitted,

ConocoPhillips Company,

By: _____

Paul Winters
Latham & Watkins LLP
*Attorneys for Defendant ConocoPhillips
Company*

Dated: January 20, 2005

Paul Winters
Latham & Watkins LLP
Riverside Center
275 Grove Street, 4th Floor
Newton, Massachusetts  02466
617-663-5700
617-663-5319

BST99 1442287-1.037771.0188
NJ'98986.2

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. CV 04-5654 E |
| vs. | ) |
| | ) |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendants El Paso Merchant Energy-Petroleum Company and Coastal Oil New England, Inc., by and through their undersigned counsel, hereby consent to the removal of this action by certain defendants, including ExxonMobil Corporation, from the Superior Court Department, Suffolk County, Massachusetts to the District Court of the United States for the district and division within which this action is pending.  While El Paso Merchant Energy-Petroleum Company and Coastal Oil New England, Inc. have not yet been served with the Complaint in the above-captioned matter, El Paso Merchant Energy-Petroleum Company and Coastal Oil New England, Inc. submit this Consent to Removal to indicate that they do consent to removal in the event they may be served with the aforementioned Complaint. By so consenting, El Paso Merchant Energy-Petroleum Company and Coastal Oil New England, Inc. do not accept service or otherwise waive any applicable rights or arguments, specifically including but not limited to personal jurisdiction arguments.

Dated:  January 24, 2005

By: _Tara Wilson_____

Tara Wilson (MA Bar No. 655035)
Mindy G. Davis
Brent H. Allen
Alan B. Sutton
Jennifer R. Bagosy
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
Tel: (202) 783-0800
Fax: (202) 383-6610

*Attorneys for Defendants El Paso Merchant
Energy-Petroleum Company and Coastal Oil New
England, Inc.*

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) | Removed from: Superior Court Department |
| | ) | Suffolk County, Massachusetts |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| vs. | ) | |
| | ) | Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## CONSENT TO REMOVE

Defendant Equistar Chemicals, LP consents to the removal of this action from the Superior Court Department Suffolk County, Massachusetts to the District Court of the United States for the district and division within which this action is pending.

Respectfully submitted,

By: _____

Alan J. Hoffman
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
(215) 569 5500
(215) 832 5505 (Facsimile)

Attorneys for Defendant Equistar Chemicals, LP

Dated: January 20, 2005

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

### CONSENT TO REMOVE

Defendant Giant Yorktown, Inc. consents to the removal of this action from the Superior

Court Department Suffolk County, Massachusetts to the District Court of the United States for

the district and division within which this action is pending.

Respectfully submitted,

GIANT YORKTOWN, INC.

By: _____
Robert F. Redmond

Dated: January 20, 2005

Channing J. Martin (VSB# 18887)
Robert F. Redmond, Jr. (VSB# 32292)
William W. Belt, Jr. (VSB# 31898)
Turner A. Broughton (VSB# 42627)
Williams Mullen
1021 East Cary St., 17th Floor
Two James Center
Richmond, Virginia 23218
804.643.1991
804.783.6507

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant Lyondell Chemical Company consents to the removal of this action from the

Superior Court Department Suffolk County, Massachusetts to the District Court of the United

States for the district and division within which this action is pending.

Respectfully submitted,

By: _____

Alan J. Hoffman
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
(215) 569 5500
(215) 832 5505 (Facsimile)

Attorneys for Defendant Lyondell
Chemical Company, individually and formerly
known as Lyondell Petrochemical Company and
formerly known as ARCO Chemical Company

Dated: January 20, 2005

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) | Removed from: Superior Court Department |
| | ) | Suffolk County, Massachusetts |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| vs. | ) | |
| | ) | Honorable _____ |
| AMERADA HESS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CONSENT TO REMOVE

Defendant LYONDELL-CITGO Refining LP consents to the removal of this action from the

Superior Court Department Suffolk County, Massachusetts to the District Court of the United States

for the district and division within which this action is pending.

Respectfully submitted,

LYONDELL-CITGO Refining LP

By: _____

Thomas M. Farrell

Dated: January 26, 2005

NICKENS KEETON LAWLESS
   FARRELL & FLACK LLP
600 Travis St., Ste. 7500
Houston, TX 77002
(713) 571-9191
(713) 571-9652 (Fax)

24775v1

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant Lyondell Petrochemical GP, Inc. consents to the removal of this action from

the Superior Court Department Suffolk County, Massachusetts to the District Court of the United

States for the district and division within which this action is pending.

Respectfully submitted,

By: _____

Alan J. Hoffman
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
(215) 569 5500
(215) 832 5505 (Facsimile)

Attorneys for Defendant Lyondell
Petrochemical GP, Inc. individually and as
general partner of Equistar Chemicals, LP

Dated: January 20, 2005

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant PDV Midwest Refining, L.L.C. consents to the removal of this action from the

Superior Court Department Suffolk County, Massachusetts to the District Court of the United

States for the district and division within which this action is pending.

Date:  January 25, 2005

Respectfully submitted,

PDV Midwest Refining, L.L.C.

J. Owen Todd
Lisa G. Arrowood
Kathleen Genova
Todd & Weld LLP
28 State Street
Boston, MA 02109
Phone:  (617) 720-2626
Fax:  (617) 227-5777

-and-

Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
EIMER STAHL KLEVORN & SOLBERG LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Phone:  (312) 660-7600
Fax:  (312) 692-1718

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. 04-5654 |
| vs. | ) |
| | ) |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant Placid Refining Company LLC consents to the removal of this action from the

Superior Court Department Suffolk County, Massachusetts to the District Court of the United

States for the district and division within which this action is pending.


Dated: January 26, 2005


Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By:

John C. Childs
Benjamin E. Wolff III
Emily A. Poler
Michael R. Galligan
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700

*Attorneys for Placid Refining Company LLC*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

### CONSENT TO REMOVE

Defendant SUNOCO, INC. and SUNOCO, INC. (R&M) consent to the removal of this

action from the Superior Court Department Suffolk County, Massachusetts to the District Court

of the United States for the district and division within which this action is pending.

Respectfully submitted,

SUNOCO, INC. and SUNOCO, INC. (R&M)

By: _____
One of Its Attorneys

Dated: January 14, 2005

John S. Guttmann, Esq. (JG 7601)
BEVERIDGE & DIAMOND, P.C.
1350 I Street, N.W., Suite 700
Washington, D.C. 20005
(202) 789-6000

44726v.1 <NewYork> 011786

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | )   Removed from: Superior Court, |
| | )   Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | )   DOCKET NO.: 05 _____ |
| vs. | ) |
| | ) |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant, The Premcor Refining Group Inc., named in the complaint as "The Premcor Refining Group Inc., individually and formerly known as Clark Refining" consents to the removal of this action from the Superior Court, Suffolk County, Massachusetts to the United States District Court for the District of Massachusetts.

DEFENDANT
THE PREMCOR REFINING GROUP INC.

By: _____
    Amy M. McCallen
    BBO # 643657
    Pepe & Hazard LLP
    225 Franklin Street
    Boston, MA 02110
    Tel. 617.748.5500
DATED: January 21, 2005     Fax 617.748.5555

1

# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department<br>) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. _____ |
| vs. | ) |
| | ) Honorable _____ |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendant TOTAL PETROCHEMICALS USA, INC. f/k/a ATOFINA Petrochemicals, Inc. consents to the removal of this action from the Superior Court Department, Suffolk County, Massachusetts to the District Court of the United States for the district and division within which this action is pending.

Respectfully submitted,

Dated:  January 21, 2005

BRACEWELL & PATTERSON, L.L.P.

By: _____
　　　Tracie J. Renfroe
　　　M. Coy Connelly

Attorneys for Defendant
TOTAL PETROCHEMICALS USA, INC.
F/K/A ATOFINA PETROCHEMICALS,
INC.

Tracie J. Renfroe, Esq.
M. Coy Connelly, Esq.
BRACEWELL & PATTERSON, L.L.P.
711 Louisiana Street, Suite 2900
Houston, Texas 77002-2781
Telephone:  (713) 221-1305
Telecopier:  (713) 221-2159

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS | ) Removed from: Superior Court Department |
| | ) Suffolk County, Massachusetts |
| Plaintiff, | ) |
| | ) Case No. CV 04-5654 E |
| vs. | ) |
| | ) |
| AMERADA HESS CORPORATION, et al. | ) |
| | ) |
| Defendants. | ) |

## CONSENT TO REMOVE

Defendants Unocal Corporation and Union Oil Company of California, by and through their undersigned counsel, hereby consent to the removal of this action by certain defendants, including ExxonMobil Corporation, from the Superior Court Department, Suffolk County, Massachusetts to the District Court of the United States for the district and division within which this action is pending. While Unocal Corporation and Union Oil Company of California have not yet been served with the Complaint in the above-captioned matter, Unocal Corporation and Union Oil Company of California submit this Consent to Removal to indicate that they do consent to removal in the event they may be served with the aforementioned Complaint. By so consenting, Unocal Corporation and Union Oil Company of California do not accept service or otherwise waive any applicable rights or arguments, specifically including but not limited to personal jurisdiction arguments.

Dated: January 24, 2005

By: _____

Tara Wilson (MA Bar No. 655035)
Mindy G. Davis
Brent H. Allen
Alan B. Sutton
Jennifer R. Bagosy
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
Tel: (202) 783-0800
Fax: (202) 383-6610

Elizabeth M. Weaver
Joanne Lichtman
HOWREY SIMON ARNOLD & WHITE LLP
500 South Hope St.
Suite 1100
Los Angeles, CA 90071
Tel: (213) 892-1800
Fax: (213) 892-2300

*Attorneys for Defendants Unocal Corporation and
Union Oil Company of California*

UNITED DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS ) | Removed from:  Superior Court |
| ) | Department |
| Plaintiff, ) | Suffolk County, Massachusetts |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| AMERADA HESS CORPORATION, et al., ) | Honorable _____ |
| ) | |
| Defendants. ) | |

## CONSENT TO REMOVE

Defendants Flint Hills Resources, LP, and FHR/GP LLC, which have not yet been served

with process, and without waiving any objections to lack of personal jurisdiction, consent to the

removal of this action from the Superior Court of Suffolk County, Massachusetts to the United

States District Court for the District of Massachusetts.

Respectfully submitted,

FLINT HILLS RESOURCES, LP
FHR/GP LLC

By: _Wayne F. Dennison_ /mln
     Counsel

Dated: January 20, 2005

Wayne F. Dennison
BROWN RUDNICK BERLACK
ISRAELS LLP
One Financial Center
Boston, Massachusetts 02111
(617) 856-8247
(617) 856-8201 (fax)

Joseph C. Kearfott
HUNTON & WILLIAMS LLP
951 E. Byrd Street
Richmond, Virginia 23219
(804) 788-8200
(804) 788-8218 (fax)

Stuart A. Raphael
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia  22102
(703) 714-7400
(703) 714-7410 (fax)

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF LOWELL, MASSACHUSETTS ) | Removed from: Superior Court Department |
| ) | Suffolk County, Massachusetts |
| Plaintiff, ) | |
| ) | Case No. _____ |
| vs. ) | |
| ) | Honorable _____ |
| AMERADA HESS CORPORATION ) | |
| ) | |
| Defendants. ) | |

## SERVICE LIST

Richard M. Sandman
Rodman, Rodman & Sandman, PC
442 Main Street, Suite 300
Malden, MA 02148-5122
Tel:    781-322-3720
Counsel for City of Lowell, Massachusetts

Scott Summy
Stephen Johnston
Baron & Budd, PC
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Tel:    214-521-3605
Counsel for City of Lowell, Massachusetts

Robert J. Gordon
Weitz & Luxenberg, PC
180 Maiden Lane, 17th Floor
New York, NY 10038-4925
Tel:    212-558-5505
Counsel for City of Lowell, Massachusetts

Robert H. Cox
Mindy G. Davis
Brent H. Allen
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Tel:    202-783-0800

1

Counsel to Amerada Hess Corporation, Coastal Oil New England, El Paso Merchant Energy-
Petroleum Company, United Refining Company, Union Oil Company of California d/b/a Unocal
Corp., Unocal Corp.

Joseph L. Luciana III
Kirkpatrick & Lockhart LLP
Henry W. Oliver Bldg.,
535 Smithfield Street
Pittsburgh, PA 15222-2312
Tel:    412-355-8982
Counsel to American Refining Group, Inc.

J. Andrew Langan
Mark S. Lillie
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Tel:    312-861-2000
Counsel to Atlantic Richfield Company, BP Amoco Chemical Co., BP Products North America
Inc.

Tracie J. Renfroe
M. Coy Connelly
Bracewell & Patterson, LLP
711 Louisiana Street, Suite 2900
Houston, Texas 77002
Tel:    713-221-1404
Counsel to Total Petrochemicals USA, Inc. (formerly known as Atofina Petrochemicals, Inc.),
Colorado Refining Company, TPI Petroleum, Inc., Valero Energy Corporation, Valero
Marketing and Supply Company, Valero Refining Co., Valero Refining and Marketing Co.

Mark E. Tully
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109
Tel:    617-570-1000
Counsel to Chelsea Sandwich, LLC, Cumberland Farms, Inc., Global Companies, LLC, Global
Montell Group, LLC, Global Petroleum Corp., Gulf Oil Limited Partnership

Christopher J. Garvey
Goodwin Procter LLP
599 Lexington Avenue
New York, NY 10022
Tel:    212-459-7413
Counsel to Gulf Oil Limited Partnership

2

Richard E. Wallace, Jr.
Peter C. Condron
Wallace King Marraro & Branson, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
202-204-1000
Counsel to ChevronTexaco Corp., Chevron U.S.A., Inc., Equilon Enterprises LLC, Motiva
Enterprises LLC, Shell Oil Company, Shell Oil Products Company, Shell Oil Products Company
LLC, Shell Petroleum Inc., Shell Trading Co. (US), Texaco, Inc., TMR Company

Nathan P. Eimer
Pamela R. Hanebutt
Lisa S. Meyer
Eimer Stahl Klevorn & Solberg, LLP
224 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
312-660-7600
Counsel to CITGO Petroleum Corporation, CITGO Refining and Chemicals Company LP, PDV
Midwest Refining LLC

John McGahren
John C. Corbett
Latham & Watkins LLP
One Newark Center, 16th Floor
Newark, NJ 07101-3174
Tel:    973-639-7270
Counsel to ConocoPhillips Company

Alan J. Hoffman
Blank Rome LLP
One Logan Square
Philadelphia, Pennsylvania 19103
215-569-5500
Counsel to Equistar Chemicals, LP, Lyondell Chemical Company, Lyondell Petrochemical GP,
Inc.

Joseph C. Kearfott
Stuart A. Raphael
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA 23219
Tel:    804-788-8200
Counsel to FHR/GP, LLC, Flint Hills Resources, LP

Robert Redmond

3

Turner Broughton
Williams Mullen
1021 E. Cary Street, 17th Floor
Two James Center
Richmond, VA 23219
P.O. Box 1320
Richmond, VA 23218-1320
Tel:    804-783-6439
Counsel to Giant Yorktown, Inc.

Thomas M. Farrell
Nickens, Keeton, Lawless, Farrell & Flack, LLP
600 Travis Street, Suite 7500
Houston, Texas 77002
Tel: (713) 353-6677
Counsel to Placid Refining Co. LLC

Ann C. Barron
Bryan Cave
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO  63102-2750
Tel:    314-259-2687
Counsel to The Premcor Refining Group

James B. Slaughter
John S. Guttmann
Beveridge & Diamond PC
1350 I Street, Suite 700
Washington, DC 20005
Tel:    202-789-6000
Counsel to Sunoco, Inc., Sunoco, Inc. (R&M)

Heather M. Fusco
Keith T. Tashima
Beveridge & Diamond, P.C.
477 Madison Avenue, 15th Floor
New York, New York 10022
212-702-5400
Counsel to Sunoco, Inc. and Sunoco, Inc. (R&M)

4